**In the Matter of Isaac SILVERMAN, Bankrupt.**

**Bankruptcy No. 77 B 2988.**

United States Bankruptcy Court, S. D. New York.

April 24, 1981.

See also, Bkrtcy., 1 B.R. 107.

Weil, Gotshal & Manges, New York City, for Leucadia, Inc.

Erwin L. Corwin, New York City, for bankrupt.

## DECISION ON OBJECTIONS TO DISCHARGE OF BANKRUPT.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Leucadia, Inc. (formerly James Talcott, Inc.) a creditor of Isaac Silverman, the above-named bankrupt, holding a claim in excess of eighteen million dollars, filed a complaint objecting to the bankrupt's discharge on grounds specified under § 14 of the former Bankruptcy Act. Leucadia now seeks an order for summary judgment pursuant to Bankruptcy Rule 756. The bankrupt has opposed Leucadia's motion for summary judgment and has cross-moved for summary judgment dismissing Leucadia's amended complaint.

The bankrupt originally filed a petition for a real estate arrangement under Chapter XII of the former Bankruptcy Act on December 23, 1977, which was aborted by an adjudication in bankruptcy on May 12, 1978. On January 19, 1979, Leucadia filed with this court its complaint objecting to the bankrupt's discharge, which was followed by an amended complaint filed July 20, 1979. The bankrupt filed his answer on August 9, 1979. The amended complaint contains twenty-five specified claims under six subsections of § 14(c) of the former Bankruptcy Act upon which Leucadia seeks to deny the bankrupt's discharge. The only two subjections which are not alleged are § 14(c)(5), relating to a previous discharge within six years and § 14(c)(8) dealing with nonpayment of filing fees.

Leucadia's motion for summary judgment is based upon the following five grounds proscribed under § 14(c):

1. Silverman has allegedly committed offenses punishable by imprisonment as provided under title 18, United States Code, Section 152 in that he has knowingly and fraudulently concealed property from his creditors; and knowingly and fraudulently made false oaths in relation to this proceeding. § 14(c)(1).

2. Silverman, without justification, has allegedly destroyed personal financial records and failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained. § 14(c)(2).

3. Subsequent to the first day of the twelve months immediately preceding the filing of his petition in bankruptcy, Silverman has allegedly concealed his interest in certain other property, and has transferred certain other property and retained an interest in that property. § 14(c)(4).

4. Silverman has allegedly, in the course of this proceeding, refused to obey five lawful orders of this court. § 14(c)(6).

5. Silverman has allegedly failed to explain satisfactorily the loss of substantial assets. § 14(c)(7).

Summary judgment is a drastic remedy, since it cuts off a party's right to present his case and, therefore, is available only under limited circumstances. It is not more readily available merely because, as in this case, both parties seek it. *American Manuf. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272 (2d Cir. 1967). In deciding a motion for summary judgment the court does not try issues of fact; "it can only determine

whether there are issues to be tried" and in so doing must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought. *United States v. Diebold*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). The moving party has the burden to demonstrate the absence of any material factual issue genuinely in dispute. *Heyman v. Commerce and Industry Insurance Co.*, supra. The court must be specially circumspect when dealing with a right to a discharge, since the Bankruptcy Act was intended to permit an honest debtor to get a fresh start free from debt, and since § 14 of the Act must be construed strictly against the objections and liberally in favor of the bankrupt. *In re Adlman*, 541 F.2d 999 (2d Cir. 1976); *In re Kokoszka*, 479 F.2d 990, 997 (2d Cir. 1973), aff'd sub nom. *Kososzka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974); *In re Tabibian*, 289 F.2d 793, 795 (2d Cir. 1961). Moreover summary judgment is particularly inappropriate where issues are raised as to the state of mind, intent and knowledge of the parties. *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir. 1973).

Of the twenty-five claims asserted in Leucadia's amended complaint, two grounds do not involve questions of fact concerning the bankrupt's state of mind or intent; namely the failure to keep or preserve books of account or records from which the bankrupt's financial condition might be ascertained, as proscribed under § 14(c)(2) and the allegation that he refused to obey five lawful orders of this court, as required under § 14(c)(6). The remaining allegations in the amended complaint raise issues of fact as to the bankrupt's intent which would preclude the granting of summary judgment.

### FAILURE TO KEEP RECORDS

With regard to proof as to this issue, Judge Pierce stated the rule as follows in *In re Jacob P. Lefkowitz*, 4 Bankr.Ct.Dec. 835, 836 (S.D.N.Y.1978), aff'd 603 F.2d 213 (2nd Cir. 1979), *cert. den.*, 444 U.S. 835, 100 S.Ct. 69, 62 L.Ed.2d 45 (1979):

"With respect to the burdens to be imposed on the various parties, Rule 407 of the Rules of the Bankruptcy Procedure provides that a plaintiff . . . has the burden of proving facts essential to his objection to the discharge. This rule does not change the initial burden which is placed upon the bankrupt of producing records from which his financial condition may be ascertained. See Advisory Committee's Note to Bankruptcy Rule 407; *In re Martin*, 554 F.2d 55, 58 (2d Cir. 1977)."

In this case, the bankrupt was actively engaged in the business of owning, operating and developing commercial real estate and holding numerous properties in New York City and White Plains.[1] His gross receipts from his real estate operations admittedly exceeded $3,000,000 in 1977. On the date he filed his Chapter XII petition his liabilities exceeded $30,000,000, although his schedules reflect assets of only $2,600 in cash and encumbered real estate, while showing a withdrawal of over $206,000 from the business in the year immediately preceding the filing of the Chapter XII petition.

In light of the foregoing the bankrupt asserts in his opposing affidavit that it is "not my legal obligation" to account for all his living expenses and that his "standard of living had absolutely no relationship to this bankruptcy proceeding." The bankrupt admitted in his affidavit that with respect to the record of his personal expenses: "I just never kept them."

The bankrupt's failure to keep records as to his personal financial condition in order to afford his creditors an opportunity to ascertain what happened to the $206,000 prepetition withdrawal is candidly admitted in his sworn affidavit in opposition to Leucadia's motion for summary judgment, in which he states in pertinent part as follows:

---

1. 112 East Post Road, White Plains, N.Y.; 150–156 Grand Street, White Plains, N.Y.; 134 Court Street, White Plains, N.Y.; 315 Park Avenue South, N.Y., N.Y.; 139 Center Street, N.Y., N.Y.; 93–99 Lafayette Street, N.Y., N.Y.; and 354 Broadway, N.Y., N.Y.

"I also had stated under oath in the statement of affairs that *I drew for myself from my real estate business approximately $206,000 in the twelve months prior to the bankruptcy* and in the Boger Affidavit, the withdrawal of this amount is substantially confirmed by the report of the accountants.

It is apparent that the entire line of objection raised by Leucadia has nothing to do with how I ran the real estate business, or what happened to the income collected by the real estate business, or even, how the money was spent by the business. On the contrary, *Leucadia demands a minute accounting of the money spent on my personal living*, the total amount of which I disclosed in both my schedules and in my various meetings with the accountants for Leucadia, the Trustee in bankruptcy and even in my bankruptcy examination. Since I am able to account for the business receipts and disbursements, Leucadia's claim that *unless I account for all my living expenses*, I have withheld information from them, is clearly unfair and *not my legal obligation*.

Even more significant, my standard of living had absolutely no relationship to this bankruptcy proceeding, which was caused by a downturn in the real estate market in the late 1970s, thus preventing the properties from generating funds to pay the expenses.

For many years, I have not kept a personal checking account into which I deposited my withdrawals from the business. This was simply not my way of living, because I would use the funds from cashing the checks to pay my expenses, or make gifts to my children. *I did not destroy any records for my personal expenses—I just never kept them.*

The only exception was the small checking account which I disclosed in my schedules and statement of affairs in the Sun Bank of Bal Harbour, Bal Harbour, Florida.

As the schedules show, I had approximately $2,500 on deposit there, which amount is absolutely trivial in face of the *$3,000,000 in gross receipts for my real estate business*, for 1977, all of which is accounted for. I don't even recall ever looking at any bank statement or cancelled checks for that account, because the account was only a convenience for me when I or any of my family were visiting Florida. It is ludicrous to accuse me of intentionally destroying the account records when I disclosed the account's existence under oath. *I did not destroy the records—I merely didn't bother to keep them.* Further, if the Trustee or Leucadia were really concerned with any information pertaining to that account, they could have obtained the information by subpoenaing the bank, but they knew it was not worth the effort.

One last point remains to be mentioned. The Cumming Affidavit on this point gratuitously and unnecessarily refers to the house in Harrison, New York, where I have lived with my wife and children since 1973, together with countless pages of testimony taken of me, my wife and another person about the house's contents.

The testimony is clear that the house and furnishings, none of which were purchased in the year before the filing of the petition, have always belonged to the children and to my wife. Equally clear in testimony is that my wife and I have always made annual gifts to the children in cash. Further, my wife has testified that before 1973, over four years before this insolvency proceeding, at one moment in time, *she had $250,000 in cash in the house, which was primarily the children's money, part of which was loaned to me for the real estate operation and part of which was used to* buy the Harrison house in 1973.

However, *all of this is immaterial* in relation to my business affairs for the year prior to the filing of the petition, but has been inserted solely to attempt to prejudice this Court into believing that I have not acted properly." [Emphasis added]

Evidently the bankrupt believes that his creditors are only entitled to know what went on in his real estate business (although Leucadia also charges that his business records do not meet the standard required under § 14(c)) and that what he did with the money from the business is not their business. This distinction between his business activities and his personal assets is totally unwarranted when viewed in the context of the bankrupt's personal adjudication. The bankrupt's business is not a separate entity; his creditors are entitled to ascertain his total financial condition, not merely those transactions involving his real estate activities. Complete disclosure is the touchstone, as stated in the leading case of *In re Underhill*, 82 F.2d 258, 259–260 (2d Cir. 1936), *cert. den.* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936), as follows:

> "*Intent to conceal the financial condition is no longer a necessary element to support an objection to a discharge for failure to keep books.* Nix v. Sternberg, 38 F.(2d) 611 (C.C.A.8), *certiorari denied* 282 U.S. 838, 51 S.Ct. 20, 75 L.Ed. 744; *In re Krulewitch*, 60 F.(2d) 1039 (D.C.N.J.). The law is not unqualified in imposing a requirement to keep books or records, and it does not require that if they are kept they shall be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances. *Complete disclosure is in every case a condition precedent to the granting of the discharge*, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies. *Nix v. Sternberg*, supra; *Karger v. Sandler*, 62 F.(2d) 80 (C.C.A.2); *In re Miller*, 5 F.Supp. 913 (D.C.Md.). While it is always open to the bankrupt to affirmatively justify his failure to keep records, each case must stand upon its own facts with the inquiry always as to whether the bankrupt has sustained this burden of justification which the statute places upon him for his failure to keep adequate records. *Where the bankrupt was involved in many transactions of an extensive character, a sub-stantially accurate and complete record of his affairs is a prerequisite to his discharge.* With obligations outstanding in large sums in the form of notes to banks and to others, *it was a matter of importance that this bankrupt maintain records from which his financial condition could be ascertained.* His attempt to substitute stubs and brokerage accounts through brokerage statements for books which should reflect his true business transactions is insufficient to comply with the requirements of the Act. The purpose and intent of section 14b of the Bankruptcy Act is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs. It was never intended that a bankrupt, after failure, should be excused from his indebtedness without showing an honest effort to reflect his entire business and not a part merely. To be sure, there may be record which are not books; but it is intended that there be available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained. Records of substantial completeness and accuracy are required so that they may be checked against the mere oral statement or explanations made by the bankrupt. See *International Shoe Co. v. Lewine*, 68 F.(2d) 517, 518 (C.C.A.5). [Emphasis added]

The bankrupt did not even attempt to produce a checkbook or a single receipt reflecting the whereabouts of the $206,000 he admittedly withdrew from his business the year before he filed his Chapter XII petition. The total absence of any personal financial records makes it impossible to ascertain the bankrupt's financial condition as of December 23, 1977, when the petition was filed. That he simply did not keep such records is patently no justification for failure to comply with the mandate of § 14(c)(2). A bankrupt's records need not state in detail all of the transactions if they sufficiently identify the transactions so that intelligent inquiry can be made con-

cerning them. *Hedges v. Bushnell*, 106 F.2d 979 (10 Cir. 1941); *International Shoe Co. v. Lewine*, 68 F.2d 517 (5 Cir. 1934). The bankrupt's creditors are not required to risk the concealment of assets under the guise of a chaotic or incomplete set of records. *Burchett v. Myers*, 202 F.2d 920 (9 Cir. 1953).

The bankrupt's admitted failure to keep any financial records as to his personal affairs or as to the whereabouts of the $206,-000 he withdrew from his business the year before the petition amply supports Leucadia's motion for summary judgment denying the bankrupt's discharge. There are no genuine issues of fact as to this issue, since those who had a right to know, namely the trustee and the bankrupt's creditors, simply had no basis for ascertaining his true financial condition when he filed his Chapter XII petition. Having been legally obligated to keep some meaningful record as to his personal affairs, which were extensive and involved large amounts of cash, the bankrupt's discharge must be denied by his own admission that: "I just never kept them" and "I did not destroy the records—I merely did not bother to keep them."

## REFUSAL TO OBEY COURT ORDERS

On March 8, 1978, Leucadia (then called James Talcott, Inc.) moved this court pursuant to Bankruptcy Rule 205 for the production of certain financial documents for the three previous years and for an order compelling the bankrupt to comply with Bankruptcy Rule 218(4) and Local Bankruptcy Rule XI–5(2) and file with the court operating statements for January, February and March, 1978. On April 11, 1978, this court entered three orders directing the bankrupt to produce the financial documents and to file operating statements for January, February and March 1978.

The bankrupt failed to comply with these orders, resulting in an application by Leucadia (then Talcott), dated May 2, 1978, for an order holding the bankrupt in civil contempt for failing to obey the three orders, dated April 11, 1978. This court thereafter entered an order dated September 1, 1978,

which recited that the bankrupt, without justification, has failed to comply with the three orders. The September 1, 1978 order then directed the bankrupt to comply with the three previous orders and to file operating statements for the debtor-in-possession period from December 23, 1977 through May 12, 1978. The order also noted that the bankrupt had not sought or obtained any protective order or any other relief excusing his compliance with this court's orders.

On March 13, 1979, Talcott (now Leucadia) took the depositions upon oral examinations of the bankrupt, his wife and son pursuant to notices of deposition and subpoenas previously served. At the depositions various objections were raised by counsel for the witnesses, who directed them not to answer the questions on grounds of irrelevancy. Thereafter Talcott (now Leucadia) moved for an order compelling the deponents to answer all questions they previously refused to answer. On the return date of the motion the parties stipulated that the witnesses would be produced for examination in the Bankruptcy Court. This Court entered a memorandum endorsement disposing of the motion in accordance with the stipulation. However, the deponents did not appear for the stipulated examination, resulting in Talcott's (now Leucadia) motion for an order directing them to appear for examinations and to answer the questions they previously refused to answer. Additionally, Talcott (now Leucadia) moved for an order directing the bankrupt's accountant to appear for a Rule 205 examination, which he previously failed to do. The motion was granted with the issuance of an order dated December 19, 1979, directing the bankrupt to pay to Talcott (now Leucadia) the sum of $500 to cover the costs and fees allowed for having been compelled to make such application.

At his deposition on February 13, 1980, the bankrupt swore that he did not intend to pay Leucadia the $500 ordered by this Court. To date he has refused to obey this order.

The bankrupt did file with this Court operating statements for January and February, 1978, although the information was not in full compliance with Local Rule XI–5(2). However, he has failed to obey this Court's four previous orders to file operating reports for the entire debtor-in-possession period, which would include the months of March, April and up to May 12, 1978.

The bankrupt attempts to explain his failure to comply with five orders of this Court; his nonpayment of the $500 award and his failure to file the operating statements for March through May 12, 1978 on the ground that he does not have $500 nor can he afford the services of an accountant to perform this work. This disengenuous response defies credulity in light of the fact that the bankrupt has retained at least six different firms of experienced lawyers to handle and represent him with respect to various proceedings in this case, all of whom do not appear to have performed on a pro bono basis.[2] That he can obtain the services of these lawyers but cannot induce the accountant upon whom he previously relied to manage his financial affairs or, for that matter any other accountant, to prepare the operating statements for the debtor-in-possession period, does not merit credence or constitute justification for failure to obey five court orders.

Complete and proper operating reports for the entire debtor-in-possession period are essential ingredients in any bankruptcy proceeding; otherwise the creditors are deprived of vital information as to how much income was actually received, who was paid during this period, the specifics as to disbursements for all purposes, the amount of indebtedness incurred and remaining unpaid and contractual and other obligations assumed. See Local Rule XI–5 (made applicable in Chapter XII by Local Rule XII–1). If the trustee and creditors do not have this information they are seriously handicapped and prejudiced in their efforts to ascertain an individual bankrupt's true financial condition following his aborted arrangement proceeding. A bankrupt who wishes to obtain a discharge should not be permitted to keep his creditors in the dark, especially when the bankruptcy court has ordered him to do otherwise.

■ The bankrupt's refusal to comply with this Court's previous five orders is a flagrant insult to the integrity of this Court; especially when the bankrupt made no attempt to respond as directed. Indeed, as to the $500 award for costs, the bankrupt flatly stated under oath in his deposition that he had no intention to pay this sum.

Section 14(c)(6) of the former Bankruptcy Act provides that a discharge shall be granted unless the court is satisfied that the bankrupt "in the course of a proceeding under this title refused to obey any lawful order of . . . the court . . .". There is no question that the five unappealed orders of this Court were lawful. In *1A Collier on Bankruptcy*, ¶ 14.57, p. 1429 it is stated:

> "Whether the order is lawful or not will often be the only question to be decided under § 14c(6). If the order is authorized in the words of, or by implication from, the statute, it is lawful."

This is not to say that the failure of a bankrupt to obey a lawful order of the court is an automatic bar that obviates the need to exercise any discretion. See *In re Jones*, 490 F.2d 452 (5 Cir. 1974); *In re Boudreau*, 350 F.Supp. 644, 646 (D.C.Conn. 1972). See also *In re Kokoszka*, 479 F.2d 990, 997 (2d Cir. 1973) aff'd on other grounds 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). However, in exercising discretion with regard to this issue, the court must be mindful of the fact that, as stated in *In re Jones*, supra at p. 456:

> "Certainly there are situations in which failure to obey such orders can have seriously deleterious consequences for creditors or on the authority of the court."

2. Elliot Krause, Esq. of Leinwand, Maron, Hendler & Krause, 10 East 40th Street, New York City; Kenneth Z. Berman, Esq., 111 Broadway, New York City, Gerald D. Fischer, Esq. of Lefrak, Fischer, Myerson & Mandell, 575 Madison Ave., New York City, Erwin L. Corwin, Esq., 50 East 42nd Street, New York City; Robert L. Howard, Esq., 575 Madison Ave., New York City; Paul L. Beck, Esq. and Heidi J. Bogin, Esq. of 50 East 42nd Street, New York City.

The bankrupt's failure to file the operating reports as ordered not only flouts the authority of this court but also undermines the concept of complete disclosure which is the cornerstone of all bankruptcy proceedings. Since there are no disputable issues of fact as to this charge, such failure is sufficient basis for denying his discharge independently of the other grounds asserted in the complaint.