**In re Nasser Ali FAROUKI, Debtor.**

**UNION BANK OF THE MIDDLE EAST, LTD. and Ron Cerino & Enterprise Management, Inc., Plaintiffs,**

v.

**Nasser Ali FAROUKI, Defendant.**

**Bankruptcy No. 87–00198–A.**
**Adv. No. 87–0573–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Dec. 3, 1991.

---

Richard Bartl, Tyler, Bartl, Burke & Albert, Alexandria, Va., for debtor.

James E. Grossberg, Lee Levine, and Kevin M. LaCroix, Ross, Dixon & Masback, Washington, D.C. (David R. Kuney, David & Hagner, P.C., of counsel), for Union Bank.

Richard J. Stahl, interim trustee, Dixon, Smith & Stahl, Fairfax, Va.

Dennis J. Early, Asst. U.S. Trustee, Office of the U.S. Trustee, Alexandria, Va.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

Before this Court is a complaint filed by Union Bank of the Middle East, Ltd. ("Union Bank") and Ron Cerino & Enterprise Management, Inc. ("Enterprise") seeking denial of the discharge of Nasser Ali Farouki (the "Debtor") pursuant to 11 U.S.C. § 727. Union Bank and Enterprise (collectively, the "Plaintiffs") oppose the Debtor's discharge on the following four grounds: [1]

(1) the Debtor, with intent to hinder, delay or defraud creditors, transferred, removed or concealed, or permitted to be transferred, removed or concealed, some or all of his assets within one year prior to the filing of the Debtor's petition in violation of 11 U.S.C. § 727(a)(2), including his alleged ownership interest in Dina Associated, S.A., a Liberian corporation organized in 1979 and having its principal place of business in Monte Carlo, Monaco ("Dina");

(2) the Debtor concealed or failed to keep or preserve documents, records and papers from which the Debtor's financial condition and business transactions may be ascertained in violation of 11 U.S.C. § 727(a)(3), including books and records pertaining to the alleged transfer, conveyance or sale of the Debtor's interests in Dina, a $73,000 deposit into his bank account, and an alleged $1,350 loan from his sister, as well as books and records that would explain the basis for the Debtor having liabilities in excess of $19 million and assets of only $10,000 (excluding property jointly owned with his wife);

(3) the Debtor knowingly and fraudulently, in or in connection with this case, made false oaths or accounts in violation of 11 U.S.C. § 727(a)(4), including the statement that the Debtor has never owned any interest in Dina, and the statement as to the value of furniture, clothing and other of his assets; and

---

1. In addition to the four grounds, the complaint asserts that the Debtor is not entitled to a discharge of his debt to Union Bank under 11 U.S.C. § 523. During the course of this proceeding, Union Bank informed the Court that it would not pursue its Section 523 claim and, therefore, such claim will not be analyzed.

(4) the Debtor failed to satisfactorily explain the loss of certain assets in violation of 11 U.S.C. § 727(a)(5), including the loss of his alleged interest in Dina.

A central issue with respect to each of the grounds is whether the Debtor ever had an ownership interest in Dina. Notwithstanding the Debtor's denial of such ownership, this Court concludes that the Debtor did own stock in Dina and that, for the reasons stated herein, the Debtor should be barred from a general discharge of his debts under Section 727 of the Bankruptcy Code.

After carefully considering all of the testimony and the numerous exhibits admitted in connection with this matter, and weighing the credibility of all of the witnesses, we find as follows: In early March 1984, the Dubai International Bank Limited ("Dubai Bank"), a subsidiary of Union Bank, considered a proposal to make a $5 million installment loan to Dina (the "Loan") to provide operating capital in connection with the sale of construction equipment for a project in Saudi Arabia. On March 20, 1984, the Debtor's brothers, Fawaz T. and Bassim T. Farouki, and counsel to Dina and the three Farouki brothers, Ronald J. Cerino ("Cerino"), met in New York City with Dubai Bank representatives, including Dubai Bank's counsel, Martin E. Weisberg ("Weisberg"), to discuss the terms of the proposed Loan. At that meeting, Fawaz and Bassim Farouki stated that they, along with the Debtor, owned Dina. From 1981 through 1986, the Debtor served, along with his two brothers, as one of three directors of Dina. In addition, the Debtor served as an officer of Dina. Dubai Bank insisted on having each of the Farouki brothers guarantee the Loan. Having the Debtor guarantee Dina's obligations was of particular importance to Dubai Bank because the Debtor was the only one of the three Farouki brothers who resided in the United States.

Dina's unaudited September 30, 1983 balance sheet, prepared by the accounting firm of Price Waterhouse based on information provided to Price Waterhouse by the Debtor, showed assets of $6,164,000,

liabilities of $1,296,000, paid-in capital of $500 and retained earnings of $4,867,500. Price Waterhouse also prepared financial statement forecasts, based on information provided to Price Waterhouse by the Debtor, showing net projected income for Dina between October 1983 through December 1985 of $15,169,000, and forecasted retained earnings of $20,036,500 at December 31, 1985. Dubai Bank was furnished with a balance sheet for Dina dated December 31, 1983 which showed assets of $9,366,800, liabilities of $1,317,000, and stockholders' equity of $8,049,800. The December 31, 1983 balance sheet was prepared by the Debtor with the assistance of Thomas Q. Nguyen–Pho, an accountant for an affiliate of Dina.

After the March 20, 1984 meeting, Weisberg drafted various documents to evidence the loan transaction, including a Loan Agreement, a Promissory Note and a Guaranty Agreement to be executed by the Debtor and his two brothers, Fawaz and Bassim. The draft of the Guaranty Agreement contained a statement that each of the guarantors "is a principal shareholder of the capital stock of [Dina]" and "will benefit directly from the making of the Loan" to Dina. The Guaranty Agreement had signature lines for the Debtor and his two brothers. Weisberg circulated drafts of the loan documents, including the Guaranty Agreement, to the Debtor, his brothers and Cerino for their review. Cerino negotiated with Weisberg to have several changes made to the loan documents but Cerino did not request that the statement that each of the guarantors "is a principal shareholder of the capital stock of [Dina]" be altered or deleted. Weisberg requested the corporate records of Dina and was told that such documents were kept outside the United States and were therefore unavailable.

The day prior to the March 27, 1984 closing, Cerino told Weisberg that all of the loan documents were satisfactory. Cerino also informed Weisberg that the Debtor would not be able to attend the closing. On the closing date, the Debtor executed a power of attorney prepared by Cerino pursuant to which the Debtor gave his broth-

er, Bassim, authority to execute any loan documents on behalf of the Debtor.[2]

The closing on March 27, 1984 was attended by Fawaz and Bassim Farouki, several Dubai Bank officers, Cerino and Weisberg. The closing documents included the Loan Agreement, the Promissory Note, and the Guaranty Agreement for execution by the Debtor and his brothers, Fawaz and Bassim. Prior to executing the loan documents, both Bassim and Cerino reviewed all of the documents. Neither asked that the statement in the Guaranty Agreement that each of the guarantors "is a principal shareholder of the capital stock of [Dina]" be altered or deleted, or otherwise informed Dubai Bank that the Guaranty contained an incorrect statement. The Guaranty Agreement was then executed by Fawaz, as well as by Bassim for himself and in his capacity as agent for the Debtor.

Within months after the closing, Dina defaulted on the Loan. Dubai Bank, in a letter dated October 10, 1984 addressed to the Debtor, requested Dina's audited year-end and unaudited quarter-end financial statements. The Debtor transmitted the letter to his brother Bassim who responded to the bank by a letter dated November 2, 1984, which stated that "[e]nclosed please find the financial statements for Dina Associated, S.A. and the combined personal financial statements for the principals of the Company." The letter contained Dina's unaudited financial statements as of September 30, 1984, together with a document titled "Combined Personal Financial Statements Fawaz, Bassim and Nasser Farouki September 30, 1984" which listed nine companies and the aggregate interest of all of the brothers in each company. The combined personal financial statements showed the brothers' ownership interest in Dina as 100 percent which was valued at approximately $10.5 million, and showed the broth-

ers' combined net worth at over $36 million.

In May 1985, Dubai Bank and Dina began negotiating a modification to the Loan Agreement in order to restructure the Loan. On May 8, 1985, Weisberg sent to Cerino as well as to a New York attorney representing Dina and the Farouki brothers, drafts of a first amendment to the Loan Agreement (the "First Amendment"), a replacement promissory note (the "New Note") and an affidavit of judgment by confession (the "Affidavit") for execution by each of the Farouki brothers. The First Amendment provided that "each of the Guarantors is in compliance with all terms, covenants and provisions of the Guaranty Agreement on his part to be observed or performed and each of the Guarantors hereby agrees that the Guaranty Agreement remains in full force and effect...." Attached to the Affidavit was a copy of the Guaranty Agreement executed by the Debtor.

On May 13, 1985, Weisberg, along with other representatives of the Dubai Bank, met with the Debtor, Cerino, and two other attorneys accompanying the Debtor, for the purpose of reviewing and executing the First Amendment, the New Note and the Affidavit. Weisberg testified that the closing documents "were reviewed very carefully" by the Debtor before signing them. Tr. at 84. In fact, after the Debtor, his two attorneys and another person who purportedly was an attorney for Dina reviewed the closing documents, they asked Weisberg and the Dubai Bank representatives to leave the room so they could discuss the contents of the documents privately, whereupon Weisberg and the representatives left the room. When Weisberg and the representatives returned to the room, neither the Debtor nor anyone else informed them that there was an error in the Guaranty Agreement with respect to the

**2.** The power of attorney stated, in pertinent part, that Bassim was "to fully represent and commit [the Debtor] and take any and all actions required to negotiate, execute and deliver, by and on his behalf, any agreements required by [Dubai Bank], ... including any security agreements, indemnification agreements, and

any and all related agreements, checks, drafts, instruments, undertakings, commitments, certificates ... and perform any other acts and actions in connection with the foregoing as shall be necessary and desirable and in the best interests of the undersigned, in the sole discretion of Mr. Bassim T. Farouki."

recital that each guarantor was "a principal shareholder of the capital stock of [Dina]" or any error in the First Amendment recital that "each of the Guarantors is in compliance with all terms, covenants and provisions of the Guaranty Agreement...." The Debtor later signed the First Amendment, the New Note and the Affidavit (with the Guaranty Agreement attached) in Weisberg's presence on May 13, 1985.

In early June 1985, the Debtor, Fawaz Farouki and Cerino met with Dubai Bank representatives and Weisberg in Weisberg's offices. Weisberg requested a statement as to the amount of stock each of the Farouki brothers owned in each company listed in their combined financial statements. He asked the Debtor specifically for the amount of stock the Debtor owned in all of such companies. Neither the Debtor nor anyone else at such meeting suggested that the Debtor did not own any interest in Dina or any of such other companies. Indeed, at no time between March 27, 1984, when the Guaranty Agreement was executed, and June 1985, did the Debtor, his counsel or anyone else even suggest that the Debtor might not have an ownership interest in Dina.

On June 18, 1985, after Dina defaulted on the restructured Loan, Dubai Bank obtained a confessed judgment against the Debtor in a New York state court in the amount of $3,900,517.70 (the "Judgment"). The Debtor did not enter an appearance in that lawsuit. On March 17, 1986, the Judgment was domesticated in Fairfax County, Virginia. The Debtor did not oppose such action.

On February 5, 1987, the Debtor filed with this Court a petition for relief under Chapter 7 of the Bankruptcy Code. On July 30, 1987, Dubai Bank assigned to its parent, Union Bank, all of Dubai Bank's right, title and interest in the Judgment, the Loan Agreement, the Guaranty Agreement, the New Note, and all proceeds of the foregoing. The Plaintiffs initiated this adversary proceeding by filing a complaint on September 30, 1987. An amended complaint was filed on January 15, 1988.

The Debtor's bankruptcy schedules, including an amendment thereto, show $19,572,033 in debts and $354,011 in property (all but approximately $10,000 of which is jointly owned with his wife). The Debtor's schedules do not contain any reference to ownership of stock in Dina or any of the other companies listed on the Farouki brothers' combined financial statements.

None of the over $19 million of liabilities listed on the Debtor's schedules was listed on two personal financial statements submitted by the Debtor in connection with loan applications made in 1985 and 1986. An August 5, 1985 personal financial statement submitted by the Debtor to First American Bank, N.A. (the "First American Statement"), showed the Debtor having total liabilities of $224,000. A January 31, 1986 personal financial statement provided by the Debtor to Sovran Bank (the "Sovran Statement"), showed total liabilities of $239,200.

The Debtor's schedules show household goods and furnishings worth $2,086. In contrast, the Sovran Statement showed furniture and fixtures as having a value of $60,000. The Debtor's schedules show all jewelry and wearing apparel (including 24 suits, 55 shirts and 156 other items of clothing) as having a value of $200. In contrast, the Sovran Statement valued the Debtor's jewelry and furs at $40,000. The Debtor's schedules show antiques and collectibles at $250. In contrast, the Sovran Statement showed antiques and collectibles as having a value of $20,000. The Debtor's schedules list three watches worth $50 each and a mobile telephone worth $100. Three months prior to filing his petition, the Debtor filed a Homestead Deed listing the value of the three watches at $600 and the mobile telephone at $500.

During a November 4, 1986 deposition in a case filed by Dubai Bank against Dina in the Circuit Court of Fairfax County, Virginia, the Debtor testified before a Commissioner in Chancery that in July 1986 he received a $1,350 loan from his sister. *Debtor's Nov. 4, 1986 Deposition* at 75, 78, 81. However, the Debtor did not list such loan on his schedule of liabilities filed in

connection with his petition. At trial in the case at bar, the Debtor denied that the $1,350 was a loan. *Tr.* at 175.

During that same deposition, the Debtor testified that on August 21, 1986, his wife received a $73,000 deposit into her bank account and that the Debtor transferred $73,000 from his wife's bank account to his own bank account. *Debtor's Nov. 4, 1986 Deposition* at 76. The Debtor stated that on the following day he transferred $70,000 from his account at Credit Suisse for the benefit of Oriental International Exchange Company. *Id.* at 76, 77. The Debtor stated that the transfer of funds was arranged by and on behalf of his father who owed $70,000 to Oriental International Exchange Company. However, during his June 27, 1988 deposition in this proceeding, the Debtor testified that the transfer was arranged by an unnamed friend of his father. *Debtor's June 27, 1988 Deposition* at 169, 175. At trial, the Debtor returned to his original testimony and stated that the transfer was arranged by his father. *Tr.* at 177, 193. The Debtor offered no documentation explaining the purpose of the transfer or the origin of the $73,000 deposit.

The record reveals that the Debtor is a college educated, experienced businessman. He received a degree in business administration from George Washington University in Washington, D.C. in 1979 where he majored in international business. In addition, the Debtor has served as a financial officer and maintained the books and records of several companies and served as president of an affiliate of Dina.

█ The primary purpose of federal bankruptcy law is to give honest debtors a fresh start " 'unhampered by the pressure and discouragement of preexisting debt.' " *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 113–14, 27 L.Ed.2d 124 (1970) *(quoting Local Loan Co. v. Hunt*, 292 U.S. 234, 244–245, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). The Bankruptcy Code provides debtors "a new opportunity in life and a clear field for future efforts, ..." *In re Reed*, 11 B.R. 683, 685 (Bankr. N.D.Tex.1981), *aff'd.* 700 F.2d 986 (5th Cir.

1983). Central to the "fresh start" approach is Section 727 of the Bankruptcy Code which provides for debtors to receive a general discharge of their obligations. However, acting as a check on the "fresh start" approach are provisions, barring a general discharge, which are designed "to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *In re Tully*, 818 F.2d 106, 110 (1st Cir.1987).

█ The Plaintiffs have the burden of proving their objection to discharge. *See* Bankruptcy Rule 4005. Although this burden may shift to the Debtor to present explanatory evidence once the plaintiffs have established a *prima facie* case, the ultimate burden rests with the Plaintiffs. *See In re Brooks*, 58 B.R. 462, 464 (Bankr. W.D.Penn.1986). The evidence presented must show that " 'the debtor has violated the spirit of the bankruptcy laws and should therefore be denied the privilege of eliminating the legal obligation of his debts.' " *Id.* at 465, *(quoting In re Cohen*, 47 B.R. 871, 874 (Bankr.S.D.Fla.1985)).

█ With respect to the standard of proof in this nondischargeability action, we follow the reasoning of *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir.1988), and note that the standard is one of "preponderance of evidence." In *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court held that a preponderance of the evidence standard, rather than a clear and convincing standard, applies to all exceptions from the dischargeability of debts contained in Bankruptcy Code Section 523(a), including the nondischargeability for fraud provision. In *In re Serafini*, 938 F.2d 1156, 1157 (10th Cir.1991), the Court of Appeals for the Tenth Circuit stated that it could perceive "no good reason to apply a different standard where section 727(a)(2) is involved." In light of *Grogan* and the reasoning set forth in *Serafini*, we choose to no longer follow the analysis set forth in this Court's ruling in *In re Kim*, 97 B.R. 275, 280 (Bankr.E.D.Va.1989), where we observed that a clear and convincing standard is

required in Section 727 actions involving fraud.

Because the provisions of Section 727(a) barring discharge are stated in the disjunctive, an objecting party need only prove the existence of one of the grounds for nondischargeability. However, we will examine each of the Section 727(a) grounds put forth by the Plaintiffs, beginning with Section 727(a)(5).

 Section 727(a)(5) provides that the debtor should be denied a discharge if "the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). In a proceeding involving Section 727(a)(5), the initial burden is on the party objecting to a discharge to produce evidence establishing the basis for his objection whereupon the burden shifts to the debtor to explain satisfactorily the loss or deficiency of assets. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984). The explanation must be reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went. *Federal Deposit Ins. Corp. v. Hendren (In re Hendren)*, 51 B.R. 781, 788 (Bankr.E.D.Tenn.1985). The failure to offer documentary evidence to corroborate a debtor's testimony as to the loss or disposition of assets may justify the denial of a discharge pursuant to Section 727(a)(5). *Chalik*, 748 F.2d at 619 ("Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory.").

 The Plaintiffs contend, among other things, that the Debtor was a shareholder in Dina prior to the filing of his petition, that the schedules filed in connection with his petition show that he was not a shareholder at the time of the filing, and that he has failed to satisfactorily explain the loss of his stock in Dina.[3] The Debtor denies that he ever owned stock in Dina, and insists that his brother, Fawaz, has been

the sole shareholder of Dina. Based on a thorough review of the record and after giving appropriate weight to the testimony of the witnesses, we conclude that the Debtor was a shareholder prior to the filing of his petition and that the Debtor has failed to satisfactorily explain the loss of his stock. Because we do not have Dina's original stock transfer ledger as direct evidence of the ownership structure of Dina, we must rely on the circumstantial evidence presented during this proceeding to assist us with the ownership issue.

This Court's findings reveal that (a) on March 20, 1984, the Debtor's brothers, Fawaz and Bassim Farouki, told Dubai Bank that they, along with the Debtor, owned Dina; (b) from 1981 through 1986, the Debtor served, along with his two brothers, as one of three directors of Dina; (c) the Guaranty Agreement executed by the Debtor through his agent (Bassim) on March 27, 1984 contained a statement that each of the guarantors "is a principal shareholder of the capital stock of [Dina]" and that each "will benefit directly from the making of the Loan" to Dina; (d) a draft of the Guaranty Agreement containing such language was sent to the Debtor, his brothers and their counsel several days prior to its execution; (e) neither the Debtor nor his counsel, Cerino, requested·that the statement in the Guaranty Agreement that each of the guarantors "is a principal shareholder of the capital stock of [Dina]" be altered or deleted; (f) prior to executing the loan documents, both the Debtor's brother, Bassim, and Cerino reviewed the Guaranty Agreement; (g) in a November 2, 1984 letter to Dubai Bank, the Debtor's brother, Bassim, stated that "[e]nclosed please find the ... combined personal financial statements for the principals of [Dina]", and enclosed a document titled "Combined Personal Financial Statements Fawaz, Bassim and Nasser Farouki September 30, 1984"; (h) the combined personal financial statements provided by Bassim

---

3. The Plaintiffs also contend that the Debtor has been unable to explain satisfactorily the loss of his purported ownership of several companies other than Dina that are set forth on the Farouki brothers' combined financial statement.

The evidence presented by the Plaintiffs consists primarily of such combined financial statement. This evidence, without more, is insufficient to enable this Court to find an ownership interest in such companies.

in his November 2, 1984 letter showed the brothers' ownership interest in Dina as 100 percent; (i) the First Amendment, executed by the Debtor on May 13, 1985, provided that "each of the Guarantors is in compliance with all terms, covenants and provisions of the Guaranty Agreement on his part to be observed or performed and each of the Guarantors hereby agrees that the Guaranty Agreement remains in full force and effect. . . ."; (j) attached to the Affidavit executed by the Debtor on May 13, 1985 was a copy of the Guaranty Agreement; (k) the Debtor was represented by three attorneys at the May 13, 1985 meeting during which he executed the First Amendment and the Affidavit; (l) before signing the May 13 closing documents the Debtor asked Weisberg and the Dubai Bank representatives to leave the room so the Debtor and his lawyers could discuss the contents of the documents privately; (m) the May 13 closing documents were carefully reviewed by the Debtor before he signed them; (n) no one informed Weisberg or the Dubai Bank representatives that there was an error in the Guaranty Agreement with respect to the recital that each guarantor was "a principal shareholder of the capital stock of [Dina]"; and (o) when Weisberg asked the Debtor, Fawaz Farouki and Cerino in early June 1985 for a statement as to the amount of stock each of the Farouki brothers owned in each company listed in their combined financial statement, neither the Debtor nor anyone else suggested that the Debtor did not own any interest in any of such companies.

The Debtor did not call his brother, Fawaz, to testify at trial as to whether Fawaz was the sole legal and beneficial owner of the corporate stock of Dina. Nor did the Debtor proffer any documentary evidence to support his testimony[4] that he never owned stock in Dina, other than a photocopy of a document alleged to be the stock transfer ledger of Dina showing that the Debtor's brother, Fawaz, became the sole shareholder of Dina in 1980. The photocopy was purportedly discovered by the Debtor in his basement during the week prior to trial. No evidence was offered as to the whereabouts of Dina's original stock transfer ledger. The Debtor did not explain how the photocopy found its way into boxes in his basement in view of his prior testimony that Dina records were not allowed to be kept in the United States but rather, as a matter of course, were immediately sent overseas. During depositions on September 22, 1987 and on June 27, 1988, the Debtor denied having any corporate records of Dina.

■■■■ The Plaintiffs urge this Court to rule the photocopy inadmissible on the ground that the Debtor failed to properly authenticate the photocopy and, even if properly authenticated, the photocopy constitutes hearsay which does not fall within any exception. A party who seeks to introduce written evidence must in some way authenticate it. *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 307 (5th Cir.1978) *(citing Grey v. First Nat'l Bank*, 393 F.2d 371, 386 (5th Cir.), *cert. denied*, 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968)). Federal Rules of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). The Debtor's counsel acknowledged at trial that the Debtor was not the custodian of the records. The Debtor testified that he did not remember ever previously seeing the records. The Debtor thus failed to establish that the

---

**4.** The Debtor testified in a June 27, 1988 deposition conducted pursuant to Rule 2004 that (a) he did not have any ownership interest in Dina or any other company listed on the Farouki brothers' combined financial statements provided to Dubai Bank; *Debtor's June 27, 1988 Deposition* at 62, 109, 120; (b) he had no control over the financial books and records of Dina, *Id.* at 56; (c) he did not see Dina's September 30, 1983 balance sheet prepared by Price Waterhouse or the December 31, 1983 balance sheet for Dina before the filing of this adversary proceeding, *Id.* at 57, 80; (d) he does not know where the financial records of Dina are located as such records are not allowed in the United States, *Id.* at 64; (e) he did not see the Guaranty Agreement until this adversary proceeding was initiated, *Id.* at 99; and (f) he did not participate in the negotiations regarding the repayment of the Loan after default, *Id.* at 146.

document is what he claims. Because we find that the Debtor failed to authenticate the photocopy, we need not determine whether the document is hearsay or, if it is, whether it falls within any exception to the hearsay rule.

However, assuming, *arguendo,* that the Debtor could authenticate the document and that it would fall within a hearsay exception, the document itself has very little probative value with respect to the issue of the ownership of Dina stock subsequent to 1980. There is no testimony as to when the photocopy was made and there is therefore no way of knowing whether any transfers of stock were made subsequent to 1980.[5]

Based on all of the evidence, after taking into account the credibility of the various witnesses, including the Debtor, we find that the Debtor owned stock in Dina prior to the filing of his petition, and that the Plaintiffs presented a *prima facie* case under Section 727(a)(5).

We next turn to the issue of whether the Debtor satisfactorily explained the loss of his stock in Dina. Once the party objecting to a discharge produces evidence establishing the basis for his objection under Section 727(a)(5), the burden shifts to the debtor to explain satisfactorily the loss or deficiency of assets. *Chalik,* 748 F.2d at 619; *In re Frank,* 14 B.R. 166, 168 (Bankr. S.D.Fla.1981) (the burden shifts to the debtor "to go forward with the evidence to explain satisfactorily the evaporation of the asset[s]"). The Debtor offered only his testimony that, notwithstanding the statements made in the Guaranty and the other evidence to the contrary, he did not have any ownership interest in Dina or any other company listed on the Farouki brothers' combined financial statements provided to Dubai Bank. *Tr.* at 142; *Debtor's June 27, 1988 Deposition* at 62, 109, 120. Because

the Debtor's testimony was not credible, he failed to meet his burden to satisfactorily explain the loss of his assets.

We also find that the Plaintiffs presented a *prima facie* case under Section 727(a)(5) with respect to the loss of value between the Debtor's pre-petition financial statements and the Debtor's bankruptcy schedules. The schedules show household goods and furnishings worth $2,086 while the Sovran Statement showed furniture and fixtures as having a value of $60,000. The schedules show all jewelry and wearing apparel as having a value of $200 while the Sovran Statement valued the Debtor's jewelry and furs at $40,000. The schedules show antiques and collectibles at $250 while the Sovran Statement showed antiques and collectibles as having a value of $20,000. The schedules list three watches worth $50 each and a mobile telephone worth $100 while the Debtor valued the three watches at $600 and the mobile telephone at $500 in his Homestead Deed.

The Debtor's explanation for the discrepancies is that his personal property was valued at market value when he prepared the pre-petition financial statements while that property was valued at liquidation value in his bankruptcy schedules. *Tr.* 166–168; *June 27, 1988 Farouki Deposition* at 161–168. We do not find such explanation to be credible. Such wide discrepancies between values of the Debtor's personal property cannot be explained by the difference between market value and liquidation value. Hence, we conclude that the Debtor did not meet his burden to satisfactorily explain the loss of his assets.

We turn next to the question of whether the Debtor should be denied a discharge under Section 727(a)(2). A debtor is not entitled to a discharge if the debtor, "with intent to hinder, delay, or defraud a credi-

**5.** The Plaintiffs have asked this Court to impose sanctions on the Debtor for his failure to produce the photocopy during discovery. During depositions of the Debtor on September 22, 1987 and on June 27, 1988, the Debtor denied having any corporate records of Dina. In addition, in June 1988, the Debtor filed a response to a request for production of documents wherein he contended he did not have such documents.

Just one week prior to the trial, the Debtor contends he found the photocopy in his basement while searching for a credit memo relating to the $70,000 transfer from his account in August 1986. Although we are deeply troubled by what appears to be the Debtor's lack of forthrightness, we decline to impose sanctions in light of our decision to deny the Debtor a general discharge.

tor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed" his property, within one year prior to the date of the filing of the petition. 11 U.S.C. § 727(a)(2).

The Plaintiffs contend that because the Debtor transferred $70,000 from his bank account on August 22, 1986, within one year prior to the filing of his petition, and has testified inconsistently regarding the purpose of that transaction, this Court should infer that the Debtor transferred those funds for the purpose of hindering his creditors. In addition, the Plaintiffs contend that the Debtor's failure to list on his schedules his ownership interest in Dina and the unexplained diminution in value of the personal property listed in financial statements prepared by the Debtor prior to the filing of the Debtor's petition constitute additional grounds to deny the Debtor a discharge under Section 727(a)(2).

The Debtor has given two conflicting explanations as to why the $70,000 was transferred. At a hearing on November 4, 1986 before the Commissioner in Chancery in Fairfax County as to the whereabouts of the $70,000, the Debtor stated that the transfer of funds to the Debtor for further transfer to a Credit Suisse account was arranged by his father. At a deposition on June 27, 1988, the Debtor testified that the transfer was arranged by an unnamed friend of his father. At the trial the Debtor testified that his original explanation was the accurate one. We do not find the Debtor's testimony credible and find that the $70,000 was property of the Debtor.

The Plaintiffs must establish that such transfer or concealment was made with the intent to hinder, delay or defraud creditors. The court in *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir.1987), in analyzing whether the debtor acted with fraudulent intent as required by Section 727(a)(4)(A), noted that "[b]ecause a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent

from all the facts and circumstances of a case." The *Fireman's Fund* court relied, *inter alia*, on *Farmers Co-operative Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982), which stated that "[f]raudulent intent of course may be established by circumstantial evidence, or by inferences drawn from a course of conduct." Furthermore, courts have recognized, when analyzing 727(a)(4), that a " 'reckless indifference to the truth' " is the functional equivalent of fraud. *In re Tully*, 818 F.2d 106, 112 (1st Cir.1987) (*quoting In re Diorio*, 407 F.2d 1330, 1331 (2d Cir.1969) (per curiam) ("Statements called for in the schedules ... must be regarded as serious business; reckless indifference to the truth ... is the equivalent of fraud.")).

We find merit in the Plaintiffs' allegation that an inference of fraud may be drawn from the Debtor's inconsistent statements explaining the $70,000 transfer. Not only did the Debtor display a "reckless indifference to the truth" but also offered contradictory testimony regarding the transfer which this Court does not find credible. We therefore conclude that the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2).

We do not, however, find merit in the Plaintiffs' allegation that the Debtor's omission of ownership interest in Dina constitutes grounds to deny the Debtor a discharge under Section 727(a)(2). Although the Plaintiffs offered evidence that the Debtor "transferred, removed, destroyed, mutilated, or concealed" his property, no evidence was introduced that any such transfer, removal, destruction, mutilation or concealment occurred within one year prior to the date of the filing of the petition as required by 11 U.S.C. § 727(a)(2).

Turning next to Section 727(a)(3), we note that a debtor is barred from a general discharge if the debtor has failed to keep or preserve records from which his financial condition or business transactions might be ascertained. 11 U.S.C. § 727(a)(3); *In re Baxter*, 96 B.R. 58, 60 (Bankr.E.D.Va.1989). The purpose of Section 727(a)(3) is to give creditors sufficient information from which they can

assess the debtor's estate and general financial posture. *Schultz v. Shapiro (In re Shapiro)*, 59 B.R. 844, 848 (Bankr.E.D.N.Y. 1986); *see also In re Switzer*, 55 B.R. 991, 997 (Bankr.S.D.N.Y.1986) ("in order to obtain the blessings of a general discharge the debtor must reveal and not conceal his financial condition"); *In re Silverman*, 10 B.R. 727, 731 (Bankr.S.D.N.Y.1981) ("[c]omplete disclosure is the touchstone"); *In re Tackett*, 67 B.R. 354, 359 (Bankr. E.D.Tenn.1986) ("the purpose of § 727(a)(3) 'is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs' ") (*quoting In re Underhill*, 82 F.2d 258, 260 (2d Cir.1936), *cert. denied*, 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936); *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 888 (7th Cir.1983) (a debtor "cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation"). The records produced by a debtor are adequate if they reflect the debtor's finances with a fair degree of accuracy and in a manner appropriate to the debtor's business. *Shapiro*, 59 B.R. at 848.

 Bankruptcy courts have substantial discretion in determining whether the produced records satisfy the statutory requirements of Section 727(a)(3). *Id.* The court in *In re Minesal*, 81 B.R. 477, 481 (Bankr.E.D.Wis.1988), noted that bankruptcy courts, in reviewing complaints to deny discharge under Section 727(a)(3), have considered several factors, including the debtor's education, business experience and sophistication; the complexity of the debtor's business; the amount of credit extended to the debtor during his business activity; and other extenuating circumstances.

The Debtor in the case at bar received a wire transfer into his account on or about August 21, 1986 in the amount of $73,000, and promptly transmitted the amount of $70,000 to an account at Credit Suisse.

The Debtor initially asserted that the transfers were accomplished at the request of his father. He later stated that they were accomplished at the request of a friend of his father. At trial he testified that the transfers were performed at the request of his father but did not elaborate to any significant extent. The Debtor failed to provide any books or records from which it would be possible to determine what actually occurred.

The Debtor also testified in another proceeding that he received a loan in the amount of $1,350 from his sister in July 1986. He did not show such loan on his schedule of liabilities filed in connection with his petition. At trial, the Debtor acknowledged that he received $1,350 from his sister but denied that the $1,350 was a loan. However, the Debtor failed to provide any books or records from which it would be possible to determine what actually occurred.

 Debtors are not required to keep books or records in any particular form so long as sufficient disclosure is made so that creditors are not required to guess at what actually occurred. *See In re Switzer*, 55 B.R. at 997. Because of the Debtor's failure to maintain any records regarding these two transactions, the creditors in the case at bar are required to guess at what actually occurred. In reviewing the Debtor's level of education, his experience in business and financial matters, and his experience maintaining corporate books and records, we find that the Debtor's failure to maintain books and records that would explain these two transactions was not justified under the circumstances. For the foregoing reasons, the Debtor's discharge will be denied under 11 U.S.C. § 727(a)(3).[6]

 Pursuant to Section 727(a)(4)(A), a debtor will be barred from a general discharge if the debtor knowingly and fraudu-

---

**6.** In addition, the Plaintiffs contend that the fact that the Debtor was able to incur liabilities in excess of $19 million but listed assets of only $10,000 (excluding property jointly owned with his wife) suggests that the Debtor transferred, conveyed or sold a substantial portion of his assets prior to bankruptcy but kept no books or records relating thereto. Because this Court has decided to deny the Debtor's discharge under 11 U.S.C. § 727(a)(3), it is not necessary to address this contention.

lently, in or in connection with the case, made a false oath or account. 11 U.S.C. § 727(a)(4)(A). The purpose of inquiry into a Section 727(a)(4)(A) allegation "is to ensure that dependable information is supplied for those interested in the administration of the bankruptcy estate on which they can rely without the need for the trustee or other interested parties to dig out the true facts in examinations or investigations." *In re Diodati*, 9 B.R. 804, 807 (Bankr. D.Mass.1981) (citations omitted).

In *Fireman's Fund*, 828 F.2d at 251, the Fourth Circuit stated that "the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud." In addition, the subject of the false oath must relate to a material matter. *Id. See also In re Calder*, 907 F.2d 953, 955 (10th Cir.1990). A matter is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984).

As has been frequently observed, a debtor is the only person who is able to testify as to his intent and is unlikely to admit that he acted with fraudulent intent. *See, e.g., In re Calder*, 907 F.2d 953, 956 (10th Cir.1990). Consequently, courts have recognized that "[f]raudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982). Moreover, a " 'reckless indifference to the truth' " has been determined to be the functional equivalent of fraud. *In re Tully*, 818 F.2d 106, 112 (1st Cir.1987)) *(quoting In re Diorio*, 407 F.2d 1330, 1331 (2d Cir.1969) (per curiam) ("reckless indifference to the truth . . . is the equivalent of fraud")).

The Plaintiffs contend that the Debtor's *Statement of Financial Affairs* discloses no ownership in Dina and the Debtor therefore made a false oath. To Question 2(c) of the statement, "[h]ave you been in a partnership with anyone, or engaged in any business during the six years immediately preceding the filing of the original petition herein", the Debtor responded with "[j]ust officer and director of various corporations—no sole proprietorships." Based on the record, as more fully set forth in connection with our discussion of Section 727(a)(5), we find that the Debtor was a shareholder of Dina and that his failure to disclose such ownership on his schedules was made with fraudulent intent. Moreover, this omission is material as it bears a direct relationship to the Debtor's business transactions or estate and relates to the Debtor's assets.

In addition, the Plaintiffs contend that the Debtor knowingly and fraudulently misrepresented on his schedules the value of jointly-owned furniture, clothing, watches and a mobile telephone. At trial the Debtor was asked how the value of the jointly-owned furniture, valued in February 1986 at $60,000 on the Sovran Statement was valued on his schedules at $2,086. The Debtor responded that the values set forth in the schedules represented "liquidation or fire sale value versus market value . . . plus the fact that it includes my wife, me and my wife owning that furniture." *Tr.* at 166. In addition, the Debtor valued at an aggregate of $200 the following: 55 shirts, 24 suits, 14 trousers, 16 sweaters, 24 pairs of shoes, two coats, nine jackets, one rain coat, 60 ties, 30 belts and miscellaneous underwear. The Debtor gave the same explanation as above. Finally, the Debtor listed, on his Homestead Deed, the value of three watches and a mobile telephone at $600 and $500, respectively. On his schedules the Debtor listed the same watches and mobile telephone at a value of $150 and $100 respectively.

This Court concludes, after hearing the testimony and considering all of the other evidence, that the Debtor knowingly and fraudulently made false oaths or accounts regarding the existence of his ownership of Dina and the value of his personal property. Accordingly, the Debtor will be denied a discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

For the foregoing reasons, the Debtor is hereby denied a general discharge of his debts under Sections 727(a)(2), (a)(3), (a)(4)(A) and (a)(5) of the Bankruptcy Code. An appropriate order will be entered.