**In re Phyllis Ann McFARLAND, Debtor.**

**Frederick L. RANSIER,
Trustee, Plaintiff,**

**v.**

**Phyllis Ann McFARLAND,
et al., Defendants.**

**Bankruptcy No. 2–92–07571.
Adv. No. 2–93–0180.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

July 22, 1994.

Frederick L. Ransier, Trustee, Ransier & Ransier, Columbus, OH, for plaintiff.

Richard T. Ricketts, Ricketts & Onda, L.P.A., Columbus, OH, for defendants.

Robert J. Sidman, Vorys, Sater, Seymour and Pease, Columbus, OH, for Worthington Business Center.

## OPINION AND ORDER ON COMPLAINT

BARBARA J. SELLERS, Bankruptcy Judge.

Frederick L. Ransier ("Trustee"), trustee of the chapter 7 bankruptcy estate of Phyllis McFarland ("Debtor"), seeks a declaration of the estate's interest in certain assets, the avoidance of certain transfers to Dan R. McFarland, the Debtor's spouse, as fraudulent under state law, and a denial of the Debtor's discharge.

The Court has jurisdiction in this adversary action under 28 U.S.C. § 1334(b). This is a core proceeding which this bankruptcy judge may hear and determine. See 28 U.S.C. § 157(b)(2). A related adversary action against the Debtor and her non-debtor spouse was filed by Worthington Business Center ("WBC"). The Trustee's action was tried jointly with the WBC action in April of 1994.

Phyllis McFarland filed her bankruptcy primarily to discharge a personal guaranty obligation to WBC for space leased by Anne's Collection, Inc. ("Anne's"). All other scheduled debts either are joint obligations of the Debtor and her husband which apparently are being paid on a current basis or are obligations only of Anne's.

## I. *The Estate's Interest in Certain Assets.*

Initially the Trustee seeks a declaration that certain assets, including household goods, a checking account, a certificate of deposit, certain shares in Anne's and Wainaco, and a portion of a tax refund are assets of this bankruptcy estate. The Trustee further seeks a determination that the Debtor had ownership interests in certain real properties prior to the transfer of those ownership interests to her husband in 1991.

As more fully discussed below, the Court finds that the following presumptions and evidentiary issues are relevant to establishing the ownership of property in Ohio where the alleged owners are alive and married to each other.

■ 1. Titled property, except for bank accounts, is presumed to be owned as titled, absent the establishment or imposition of a trust relationship.

■ 2. Titled bank accounts are presumed to be the property of the party whose funds they represent, absent clear and convincing evidence of some other intent.

■ 3. Ownership of untitled personal property, other than federal tax refunds, is a question of fact for which use, intent, and control are critical.

■ 4. Ownership of federal tax refunds is determined by federal law.

### A. *Real Property.*

■ Prior to August 1991 the Debtor and her husband were titled owners as joint tenants or tenants by the entirety of seven parcels of real property. The Debtor maintains that, even though her name was on the deeds to those properties, she had no ownership interest in them because she did not pay for them. Nor did she make use of the six

parcels purchased as investments. Dr. McFarland maintains that his wife's name was on the deeds only to satisfy various lending institutions and not to create any ownership interest in her.

The McFarlands' residence was titled to Dan McFarland and Phyllis McFarland, as tenants by the entirety, until 1991 when the Debtor transferred her interest to her husband. Their prior residence had been titled in both names during the 18 years they lived there. Four condominiums, known as the "Brafferton Properties", were titled jointly to Dan McFarland and Phyllis McFarland from acquisition in 1979 until 1991. Two ranch lots in Montana also were titled jointly from the date of acquisition in 1989 until 1991.

Other than working at Anne's and a later corporation known as Fashion Expo, Inc., the Debtor generally did not work outside the home during her 31 years of marriage. At the time the Brafferton Properties were acquired, the Debtor had not worked outside the home for many years. Therefore, it is not credible that a financial institution would require her name to be on the Brafferton investment property deeds. Because Ohio is one of the few states that still recognizes dower interests, a mortgagee likely would insist that she sign all mortgage deeds, whether or not she was a titled owner. It is not credible, however, that a lending institution would decide for Dr. McFarland how he should title property when payment for the property would come solely from his earnings. Nor would a financial institution be likely to require a tenancy by the entirety deed.

The Debtor and her husband have a long history of owning real estate jointly or as tenants by the entirety. The Court does not believe that mortgagee requirements were the only reasons for such forms of ownership. Further, there was no evidence of the creation of any trust and no reason to impress such a relationship. Accordingly, the Court finds that ownership interests in those properties are as titled prior to August 1991, as reflected in the conveyance language in the deeds. If the Trustee successfully avoids the Debtor's transfers of her interests in those properties to her husband in 1991, her interests will become part of her bankruptcy estate.

## B. *Personal Property.*

### 1. Stock Ownership.

The Debtor's initial bankruptcy schedules show no stock ownership. However, she owns 100 shares of Wainaco and 60% of the issued shares of Anne's. She testified that she did not initially list her Anne's stock because she thought it was worthless and she did not list her Wainaco stock because she did not think about it when the schedules were compiled. An initial amendment to her schedules lists the Anne's shares, but not the Wainaco stock.

Regardless of initial nondisclosure or the status of any amendments to her schedules, both the Wainaco and Anne's shares were titled in the Debtor's name at the time of her bankruptcy filing. No reason has been shown to change that presumption of ownership. Therefore, those shares are property of this bankruptcy estate which must be turned over to the Trustee.

### 2. The Certificate of Deposit.

The certificate of deposit at issue, in the amount of $150,000, was payable to Dan McFarland or Phyllis McFarland. Because it was not payable "to the order of" Dan or Phyllis McFarland, it was non-negotiable. Ohio Rev.Code § 1303.03(A)(4); UCC § 3–104(1)(d) (1989). The Debtor and her husband maintain that the certificate was purchased by Dr. McFarland with his separate funds and that he had no intention of giving the Debtor any interest in it.

The Trustee asserts that the ownership issue is controlled by case law in Ohio which finds a presumption of a gift when property is purchased by one person and titled in joint names of the purchaser and a family member. *Creed v. Lancaster Bank,* 1 Ohio St. 1, paragraph 3 of syllabus, (Ohio 1852) and *John Deere Indus. Equipment Co. v. Gentile,* 9 Ohio App.3d 251, 459 N.E.2d 611 (Ohio Ct.App.1983); *see also, Spencer v. Spencer,* 87 Ohio App. 539, 89 N.E.2d 496 (Ohio Ct. App.1949).

█ The Debtor and Dr. McFarland assert that the ownership issue is controlled by

case law in Ohio relating to bank accounts, as set forth in *In re Estate of Thompson,* 66 Ohio St.2d 433, 423 N.E.2d 90 (Ohio 1981). In *Thompson,* the Ohio Supreme Court held that "[a] joint and survivorship account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." *Thompson,* 66 Ohio St.2d, 423 N.E.2d 90 at paragraph 1 of syllabus. Dr. McFarland testified that he never intended to give his wife any interest in the certificate of deposit and that he believed the bank erred in the manner in which the certificate was issued.

Despite the Ohio Supreme Court's explicit limitation of the holding in *Thompson* to joint and survivorship bank accounts (*see, Thompson,* 66 Ohio St.2d at 439, 423 N.E.2d 90, n. 1), *Thompson* has been applied to the issue of ownership of a certificate of deposit. *See Kristofik v. Bank One, Akron, N.A.,* 34 Ohio App.3d 104, 105, 517 N.E.2d 272 (Ohio Ct. App.1986).

The bundle of rights represented by a non-negotiable certificate of deposit is closer to a bank account than it is to titled personal property. Therefore, the Court holds that, as a matter of Ohio law, the ownership of a non-negotiable certificate of deposit is controlled by *Thompson.* In order to overcome the presumption established by *Thompson,* the Trustee must show that Dr. McFarland intended to give the Debtor an interest in the certificate.

■ The Trustee shows Dr. McFarland's intent by establishing the following facts. The certificate of deposit was titled in the name of Dan or Phyllis McFarland. It was assigned to a bank for possible offset against funds made available to Anne's which the Debtor and her spouse were responsible for repaying. Repayment of that debt was secured in part by a mortgage against the McFarland residence. Finally, an accountant employed by the McFarlands directed the bank in September 1991 to apply "our" certificate of deposit to reduce the mortgage.

The Court finds that the Trustee has shown by the clear and convincing evidence required by *Thompson* that Dr. McFarland's

intent when the certificate of deposit was created was to use it for joint purposes. Specifically, its use was to assist in his wife's business venture. Accordingly, as a matter of Ohio law, the certificate of deposit was owned by both Dr. McFarland and the Debtor, as joint tenants.

### 3. The "Household" Checking Account.

■ The Debtor's bankruptcy schedules initially failed to disclose any interest in bank accounts. When those schedules were amended, a checking account at The Huntington National Bank was listed in the amount of $295.60.

The Debtor testified that she does not own a bank account, but pays bills from a checking account funded by her husband, known as the "household account". She stated that the money is in the household account for her to run the household. She used money in that account to pay her bankruptcy attorney and the filing fees for her personal bankruptcy, but did not discuss this account with her bankruptcy attorney because she thought of it as her husband's account. The account is in the names of both Dan and Phyllis McFarland.

Ownership of the checking account also is controlled by *Thompson,* 66 Ohio St.2d 433, 423 N.E.2d 90. Dr. McFarland's intent when he deposited money into the household account determines ownership of the funds in the account. Dr. McFarland testified that:

Q. To your knowledge, during the course of 1992, did you write any checks out of the household account that you can recall?

A. I do not recall ever writing any in 1992. Occasionally if we were some place and that was the only check book we had with us, I would write a check out of it, yes.

Q. But you would agree with me that Mrs. McFarland wrote the bulk of the checks out of the account?

A. She was the household account.

Q. And she didn't have to ask your permission?

A. No.

Q. And she could use that account as she saw fit, right?

A. Sure.

Transcript Vol. III p. 158.

The Court finds that whatever funds Dr. McFarland deposited in the household account were established by clear and convincing evidence to have been contributed to and intended for household and joint purposes. Therefore, the ownership of that account is joint, as titled. One half of the amount in that account on October 15, 1992, or $2,066.98, belongs to the bankruptcy estate and must be turned over to the Trustee. The large deposit made on October 15 was not shown to have been deposited after the bankruptcy filing, regardless of the time those funds were available for withdrawal.

#### 4. Tax Refunds.

The Trustee asserts that property of the bankruptcy estate includes the portion of the McFarlands' 1991 tax refund attributable to the Debtor's share of losses passed through from Anne's. The Trustee takes the same position with regard to any similar refund for 1992, although 1992 tax returns have not yet been prepared or filed.

■ A tax refund is apportioned to taxpayers on the basis of their respective payments of the tax. *Gordon v. U.S.*, 757 F.2d 1157 (11th Cir.1985); *Ballou v. Lentz (In re Ballou)*, 12 B.R. 611–12 (Bankr.D.Kan.1981) (debtor paid all the tax, all the refund goes into the bankruptcy estate); *In re Levine*, 50 B.R. 587 (Bankr.S.D.Fla.1985) (non-debtor spouse's share of refund doesn't go into the bankruptcy estate).

■ All of the estimated tax payments which might be the basis for a refund were made by Dr. McFarland. None were made by the Debtor. However, the tax return shows that $3,216 was paid to the Internal Revenue Service in 1991 by withholdings from earnings. It is unclear whether that $3,216 came from the Debtor or from Dr. McFarland. If it came from Dr. McFarland, then the entire tax refund is his. If it came from the Debtor's wages, then ownership of the refund must be divided between the taxpayers consistent with each one's proportion of the payments made, either through estimated tax payments or by the withholdings from wages. *See Gordon*, 757 F.2d 1157. There is no reason to penalize Dr. McFarland because the tax laws permit him to benefit as a joint taxpayer from her share of losses. Therefore, any tax refund for 1991 or 1992 belongs either to Dr. McFarland entirely as a refund of his overpayment of taxes or proportionately as discussed. Only the Debtor's proportionate share, to the extent the withheld payments were hers, would come into her bankruptcy estate.

#### 5. Household Goods.

The Trustee seeks a declaration that the Debtor has a legal or equitable interest in all untitled personal property she and her husband have acquired during their marriage, including the household goods located at their residence.

Both the Debtor and her husband assert that all of the household furnishings, including art work, furniture, and various collections, belong to Dr. McFarland because only his money was used to buy them. He was actively involved in selecting most of them and may have purchased the art and collectibles primarily on his own. Furniture and furnishings selections were most likely to have been made jointly. During their 31 years of marriage, the Debtor ran the household and cared for the children. She maintains that she resides in the residence and uses the items located there only because her husband wants her to be there. Legal authority cited for this position is *Richards v. Parsons*, 7 Ohio App. 422 (Ohio Ct.App.1916) and Ohio Rev.Code § 3103.04.

Ohio Rev.Code § 3103.04 states:

**Interest in the Property of the Other.**

Neither husband nor wife has any interest *in the property of the other,* except as mentioned in section 3103.03 of the Revised Code, the right to dower, and the right to remain in the mansion house after the death of either.... (Emphasis added).

Ohio courts generally have treated the phrase "property of the other" in section 3103.04 to mean "separate property" or "nonmarital property." *See, Walkup v. Walkup,*

31 Ohio App.3d 248, 250, 511 N.E.2d 119 (Ohio Ct.App.1986) (cash brought into marriage is non-marital property); *Palmer v. Palmer,* 7 Ohio App.3d 346, 348, 455 N.E.2d 1049 (Ohio Ct.App.1982) (residence owned before marriage is separate property, but improvements made to residence with marital funds are marital property); and *Worthington v. Worthington,* 21 Ohio St.3d 73, 488 N.E.2d 150, syllabus (Ohio 1986) (spouse may receive a proportionate share of any increase in value of a non-marital asset resulting from an investment of marital funds or labor).

"Separate property" has also been defined as "Property owned by a married person in his or her own right during marriage." Black's Law Dictionary 1224 (5th ed. 1979).

In *Richards v. Parsons,* the defendants were the estate and the daughter of James Richards. The plaintiff was the widow of James Richards. *Richards,* 7 Ohio App. 422. The plaintiff had worked for a number of years as a medical doctor and had contributed her income to her husband for him to invest and to use in running the household. *Richards,* 7 Ohio App. at 424–425.

With respect to the ownership of personal property, the Court said, " '[w]henever a husband acquires possession of the *separate property* of his wife, whether with or without her consent, he must be deemed to hold it in trust for her benefit, in the absence of any direct evidence that she intended to make a gift of it to him.' " *Richards,* 7 Ohio App. at 427 (emphasis added) (citations omitted).

With respect to personal earnings of the wife, the Court said, "[m]oney once earned by the wife for professional services, or otherwise acquired by her, as between her and her husband, remains her separate property unless a gift be proved, or that the title has been transmitted from her to him by contract for value received." *Richards,* 7 Ohio App. at 427.

The Court further held that: "[s]uch parts of her daily income as she saw fit to use in the payment of household expenses without any agreement between her and her husband that the same should be repaid, cannot be recovered from her husband's estate...."

And this is true even though it is statutory that 'the husband is the head of the family' and 'must support himself, his wife, and his minor children out of his property or by his labor.' " *Richards,* 7 Ohio App. at 428 (citations omitted).

The limitations in *Richards* are significant. The wife's income is her separate property as between her and her husband, but income used for household expenses loses its status as her separate property. Even though the husband had a legal obligation to support his wife, if the wife chose to spend her separate money for household expenses, she had no recourse against her husband.

The Ohio Attorney General has read *Richards* to say that "[t]he earnings of a spouse are that spouse's separate property.... A spouse may, however, treat his or her separate property as available for the support of either spouse." 89–030 Op. Att'y Gen. 2–125, 126 (1989) (citing "[s]uch parts of her daily income as she sees fit to use in the payment of household expenses ... cannot be recovered ...").

*Richards* creates a presumption applicable to personal property earned or otherwise acquired by one spouse that is turned over to and held by the other spouse with the communicated knowledge that the spouse whose separate property it was is merely entrusting the other party with its temporary care.

 *Richards* is not binding authority for this Court. However, it can be harmonized both with the facts of this action and with the realities of more contemporary lifestyles and realities. Both *Richards* and Ohio Rev.Code § 3103.04 make it clear that a person does not lose the right to maintain separate property solely because he or she is married. Personal property turned over to a spouse can be impressed with a trust, if the facts support such a construction.

 The Debtor and Dr. McFarland have been married for 31 years and have lived together all of that time. The Debtor had no recollection prior to her deposition in August 1992, that she ever told anyone outside her family that she didn't own any of the household goods. Nor did she recall ever discussing ownership of the household goods with

any member of her family. She testified that Dr. McFarland never told her that the couch, the silver, the dishes, the piano, or the bedroom furniture were his and not hers. When their residence was decorated, the decision to buy a particular item usually was a joint decision.

For 31 years the Debtor has had free use of the household goods. Frankly, the Court believes that the notion that her spouse owned all the household goods was adopted only after her financial problems developed. Accordingly, the Court finds that the household goods in the residence acquired during the marriage were held for the use of the household and were treated by Dr. McFarland as "available for the support of either spouse."

The presumption of separate property discussed in *Richards,* 7 Ohio App. at 427, does not apply to personal property intended for the use of the household and in the joint possession of both spouses. Such property is treated as available for the support of either spouse and is jointly owned. Therefore, with the exceptions discussed below, the Debtor has a one-half joint ownership interest in the untitled personal property in the residence. That one-half interest comes into her bankruptcy estate.

Despite that finding, however, the Court is persuaded by the testimony and the video of the house contents that Dr. McFarland has maintained as separate property certain collections of political campaign buttons, marbles, and bottles. Those items were selected by him and were purchased with his earnings. They were of no interest or use to the Debtor and were intended to remain his separate property. Those items were not held for the use of the household and were segregated in his den and used only by him. Since Dr. McFarland has not treated those items as available generally for the use of the household, they remain his separate property. Therefore, the Debtor has no interest in the collections of campaign buttons, marbles, or bottles in Dr. McFarland's den or boxed on the lower level of the house. No interest in those items will come into the Debtor's bankruptcy estate. Further, Dr. McFarland's clothes are solely his

property. Likewise, the Debtor's clothes belong only to her and are not jointly owned as testimony established that ownership and use were exclusively hers. In essence, her clothes were a gift.

## II. *Avoidance of Certain Transfers as Fraudulent.*

The Court previously has found that the Debtor had certain interests in seven parcels of real property. She transferred those interests in the McFarland residence, the Brafferton Properties, and the two Montana lots to her husband by quitclaim deeds executed August 26, 1991. The deed to the residence was filed October 11, 1991 and recorded October 23, 1991. The deeds to the Brafferton Properties were recorded on September 6, 1991, and the two Montana lot deeds were filed of record on October 3, 1991. It is these transfers the Trustee seeks to set aside. The Trustee also seeks to set aside a transfer of the Debtor's interest in the certificate of deposit.

The Trustee seeks to avoid these transfers as fraudulent conveyances under 11 U.S.C. § 544(b) and Ohio's Uniform Fraudulent Transfer Act, codified as Ohio Rev.Code Chapter 1336.

Section 544(b) of the Bankruptcy Code empowers the Trustee to

". . . avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

### A. *The Interests in Real Properties as Assets.*

For purposes of Chapter 1336, avoidance of transfers applies only to property of a debtor which has been found to be an "asset". Further, the definition of "asset" excludes property to the extent it is: (1) encumbered by a valid lien, (2) exempt under nonbankruptcy law, or (3) held in the form of tenancy by the entirety (at least to the extent it is not subject to process by a creditor holding a claim against only one tenant).

Ohio Rev.Code § 1336.01(B). Although transfer costs would affect a Trustee's actions upon the recovery of any such "assets", such costs are not considered in determining if property is an asset under state law. Likewise, real property taxes must be shown to be a lien under state law before subtraction of those amounts is appropriate.

### 1. Values over Valid Liens.

The Debtor and her husband circulated financial statements dated August 31, 1988; December 31, 1988; October 31, 1989; December 31, 1990; and February 29, 1992. These financial statements value the residence at $1,000,000 at all times except February 29, 1992, when the value is given as $1,100,000. The Brafferton Properties were valued between $160,000 and $200,000 and the Montana lots were valued at $15,000 each.

Testimony by appraisal was also introduced into evidence. That testimony appraised the residence at $1,000,000 as of August 1991. The residence appraisal was made under the assumption that the property was located near a small golf course. The appraiser stated that the same house, if located on a larger championship golf course, would be worth more. The residence actually is located on the larger course. Therefore, the Court finds that the value of the residence in August 1991 was $1,100,000.

An appraiser testified that the Brafferton Properties were worth $160,000 in August 1991. Dr. McFarland estimates that value to have been between $160,000 and $200,000. Disposal of those properties as a unit or individually could affect that value. For purposes of this action, the Court finds that the properties should be valued as of August 1, 1991 at $175,000 in the aggregate or $43,750 each.

The Court further finds that the best estimate of the value of the Montana lots in August 1991 is $15,000 for each lot. The lots may be worth less now, but the time for valuation for the Trustee's purposes is August 1991.

In determining whether the McFarland residence, the Brafferton Properties, and the Montana lots are assets under Ohio's fraudulent transfer law, the amount of valid lien encumbrances must be subtracted.

The transfer of the Debtor's interest in the McFarland residence for the Trustee's purposes occurred at the earliest on October 11, 1991, when the deed was filed with the appropriate county recorder. See Ohio Rev. Code § 1336.06(A)(1)(a). At that time valid liens against the property consisted of a first mortgage in the amount of $658,858 and a second mortgage in the amount of $100,000. Proceeds in excess of $230,000 from the certificate of deposit and the sale of Anne's inventory were applied to reduce that second mortgage after the Debtor executed her quitclaim deed, but before the deed was filed of record. Therefore, value in excess of valid liens existed in the McFarland residence at the time of transfer. Accordingly, transfer of the Debtor's interest in the McFarland residence was the transfer of an asset within the meaning of Ohio Rev.Code § 1336.-01(B)(1).

Likewise, the Brafferton Properties had valid liens against them which totalled less than the appraised values. Each property has been valued at $43,750. Mortgages against each property as of September 6, 1991, when the quitclaim deeds were filed with the appropriate county recorder, were between $34,000 and $35,000. Therefore, value existed in each property and the transfer of the Debtor's interest in each property was the transfer of an asset under Ohio's fraudulent transfer law.

The analysis of valid liens against the Montana lots is somewhat different. The existing mortgage apparently was against only one of the lots. At the time the quitclaim deed was filed on October 3, 1991, that mortgage amount was $14,879. Technically, the value of the lot, at $15,000, exceeds the amount of the mortgage. That excess is so small that the Court believes the transfer of the Debtor's interest in that property was not the transfer of an asset under Ohio's fraudulent transfer law. The other lot had no valid liens against it, however, and the transfer of the Debtor's interest in the second lot was the transfer of an asset.

### 2. Exemption under Nonbankruptcy Law.

Property transferred is also not an asset for purposes of fraudulent transfer law to the extent it can be exempted from the claims of creditors under state law. Such exemptions for a debtor's interests in property are provided by Ohio Rev.Code § 2329.66. The only exemptions applicable to the transfers of the Debtor's interest in the McFarland residence, the Brafferton Properties and the unliened Montana lot are the homestead exemption and, possibly, the catch-all exemption. The homestead exemption applies only to her interest in the McFarland residence. Even if allowed in bankruptcy, the maximum exemptible amount under Ohio Rev.Code § 2329.66(A)(1)(b) is $5,000 and under § 2329.66(A)(17) is $400. The availability of those exemptions, therefore, does not change the Court's previous holding that the transfer of the Debtor's interest in the McFarland residence in October 1991 was the transfer of an asset.

Further, even if nonbankruptcy law provides the Debtor with an exemption for her interest in her residence against the claims of her judgment creditors in the amount of $5,000, neither that exemption nor the $400 exemption in Ohio Rev.Code § 2923.-66(A)(17), which applies only in bankruptcy, would be recognized in this bankruptcy case.

The Bankruptcy Code provides that a debtor may exempt property that was involuntarily transferred and then recovered by the Trustee to the extent that the debtor could have exempted the property if it had not been transferred. 11 U.S.C. § 522(g). The Code also provides that a debtor may avoid transfers of property avoidable under § 544 that the Trustee does not attempt to avoid. 11 U.S.C. § 522(h). If the property recovered under subsection (h) is exempt property, the debtor may exempt it. 11 U.S.C. § 522(i).

In these sections Congress explicitly provided a set of narrow situations in which a debtor could exempt property that had been transferred and later recovered under the Bankruptcy Code. If the debtor could exempt all recovered property that would have been exempt had it not been transferred,

§§ 522(g) and 522(i) would have no effect. Therefore, by explicitly providing for exemption in these narrow situations, Congressional intent was to deny exemptions for recovered property outside the limits of §§ 522(g), (h), and (i). The interest in the residence was transferred voluntarily and the Trustee is seeking to avoid that transfer; therefore, the exemptions are not available.

Accordingly, the Court finds that the Debtor's exemptions under state law for her interest in the McFarland residence would not change the nature of the property as an asset even if recognized and, more likely would not be recognized against the Trustee if the transfer is avoidable. Likewise, the catch-all exemption in Ohio Rev.Code § 2329.66(A)(17) would not be available in bankruptcy for any assets transferred.

### 3. Property Held as a Tenant By the Entirety and, Therefore, Not Subject to Process.

The final exception of property from definition as an asset under state fraudulent transfer law is for property held in tenancy by the entirety to the extent such property is not subject to process by a creditor holding a claim against only one tenant.

The Debtor and her husband have asserted, by summary judgment motion and at trial, that their residence was held as an estate by the entirety. The record is devoid of any meaningful attempt by the Trustee or WBC to rebut this assertion. Accordingly, the Court holds that the Debtor had an undivided interest in the McFarland residence as a tenant by the entirety prior to the transfer of that interest to Dr. McFarland.

Under Ohio law, tenancy by the entirety property is not subject to foreclosure to satisfy the debts of only one spouse. *Central National Bank of Cleveland v. Fitzwilliam*, 12 Ohio St.3d 51, 465 N.E.2d 408 (Ohio 1984). Entirety property is subject only to debts jointly incurred by husband and wife. *Donvito v. Criswell*, 1 Ohio App.3d 53, 56–57, 439 N.E.2d 467 (Ohio Ct.App.1982); *In re Pernus*, 143 B.R. 856, 858 (Bankr.N.D.Ohio 1992).

■ Ohio's Uniform Fraudulent Transfer Act did not become effective until September 1990. *Profeta v. Lombardo,* 75 Ohio App.3d 621, 624, 600 N.E.2d 360 (Ohio Ct.App.1991). Under the previous act, known as the Ohio Uniform Fraudulent Conveyance Act, a fraudulent conveyance of an interest held as a tenant by the entirety would be avoidable only by joint creditors of both tenants. *Donvito,* 1 Ohio App.3d at 58, 439 N.E.2d 467.

This position is consistent with comments to the definition of "asset" as used in the Uniform Fraudulent Transfer Act found in the Uniform Laws Annotated, which states:

> This Act, like its predecessor and the Statute of 13 Elizabeth, declares rights and provides remedies for unsecured creditors against transfers that impede them in the collection of their claims. The laws protecting valid liens against impairment by levying creditors, exemption statutes, and the rules restricting levyability of interest in entireties property are limitations on the rights and remedies of unsecured creditors, and it is therefore appropriate to exclude property interests that are beyond the reach of unsecured creditors for the definition of "asset" for the purposes of the Act.... The definition in this Act requires the exclusion of interests in property held by tenants by the entirety that are not subject to collection process by a creditor without a right to proceed against both tenants by the entirety as joint debtors.... [T]he holder of an unsecured claim enforceable against tenants by the entirety is not precluded by the Act from pursuing a remedy against a transfer of property held by the entirety that hinders, delays, or defrauds the holder of such claim. 7A U.L.A. § 645–646 (Comment 2) (1985).

Therefore, a transfer of entirety property is avoidable only by joint creditors of both tenants.

The Debtor's initial bankruptcy schedules at Schedule F mark with an "H" each debt for which both she and her husband are liable. There are twelve unsecured creditors listed who hold approximately $900,000 in debts as joint creditors of the Debtor and her husband. The Debtor testified that, to the best of her knowledge, Exhibit 39 was true and correct when filed. Accordingly, there are creditors of the Debtor holding unsecured claims for debts that were incurred jointly with her husband, and these creditors could avoid the transfer of her interest in the entireties property if the transfer were shown to be fraudulent as to these creditors.

■ As a matter of Ohio law, the Court holds that, outside of bankruptcy, any current joint creditor of the McFarlands could avoid the transfer of the residence under § 1336(A)(2)(b). Given that any joint creditor of the McFarlands could avoid the transfer of the residence under Sections 1336(A)(1) or (A)(2)(b), the Trustee may avoid the transfer under 11 U.S.C. § 544(b). However, the Trustee may administer the property only for the benefit of administrative expenses and joint creditors. *T.R. Press, Inc. v. Whitcomb (In re Whitcomb),* 140 B.R. 396, 399 (Bankr.E.D.Va.1992); *In re Hunter,* 122 B.R. 349, 357 (Bankr.N.D.Ind. 1990).[1] *See Finneran v. Associates Financial Services (In re Blair),* 151 B.R. 849 (Bankr.S.D.Ohio 1992).

### B. *The Transfers of the Real Property Interests as Fraudulent.*

The Court has found that the Debtor's interests transferred to her husband were assets under Ohio law for six of those properties. The Court now must determine if the transfers of those assets were fraudulent to creditors.

There are three situations in which transfer of property, shown to be an asset, is fraudulent as to a creditor under Ohio Rev. Code § 1336.04. Two of those are relevant to this proceeding.

First, if the transfer was made with actual intent to hinder, delay, or defraud any creditor, it is fraudulent. Ohio Rev.Code § 1336.-04(A)(1). Second, if the transfer was made without receiving reasonably equivalent value

---

**1.** The United States District Court for the Northern District of Indiana affirmed the bankruptcy court decision. Subsequently the district court opinion was affirmed by the Court of Appeals for the Seventh Circuit. 970 F.2d 299 (7th Cir. 1992).

in exchange for the transfer when the Debtor reasonably should have believed that she would incur debts beyond her ability to pay such debts as they became due, the transfer is fraudulent. Ohio Rev.Code § 1336.-04(A)(2)(b).

## 1. Actual Intent to Defraud.

■ Ohio Rev.Code § 1336.04 defines when a transfer is fraudulent as to a creditor:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . .

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

. . .

The Debtor testified that she made the transfers because she did not want a creditor of Anne's known as Vroom, Inc. ("Vroom") to be able to attach or foreclose on the properties. Vroom had instituted a lawsuit in Texas against Anne's and both McFarlands.

Section 1336.04 lists several factors which may be considered in determining if a transfer was made with actual intent. Many of those exemplary factors were present in all or most of the Debtor's transfers, as follows:

(1) The transfers were to an insider, the Debtor's husband. *See* Ohio Rev.Code § 1336.01(G)(1)(a).

(2) The Debtor retained possession of the residence property transferred after the transfer by continuing to live in and run the household.

(3) Some of the transfers appear to be concealed because, as to the residence and the Montana lot, although executed on August 26, 1991, the deeds were not filed of record until October 11, 1991 and October 3, 1991, respectively. This appearance was caused by the delay in recordation. No one other than the McFarlands and their attorneys knew that these deeds had been executed until those dates.

(4) The Debtor had been sued by Vroom prior to the transfers.

(5) The transfers were of substantially all of the assets of the Debtor. The Debtor's bankruptcy schedules filed October 15, 1991 showed assets valued at $3,500. As discussed above, the value of the Debtors' interests in the real property assets transferred exceeded $175,000. Even though the Court has found that the Debtor has a one-half interest in the household goods, the assets transferred far exceed the value of those items and the Debtor did not believe the household goods were her assets.

(6) There was no consideration received by the Debtor which was reasonably equivalent to the value of the assets transferred. Dr. McFarland testified that he paid $20,000 to settle the Vroom litigation and that that payment was consideration for all the real property transfers. The payment to Vroom, however, was made by Anne's from its account. The settlement agreement with Vroom specifically stated that payment came only from Anne's. Further, at the time the quitclaim deeds were executed, the attorney for the Debtor and her husband, for purposes of obtaining exemptions from conveyance fees, executed statements that the transfers were gifts to Dr. McFarland from the Debtor. Based on those facts, and recognizing that Dr. McFarland probably contributed the funds to Anne's so it could pay the settlement, the Court finds that Dr. McFarland paid no consideration for the transfers to him of the Debtor's interests in the real property assets. Even if the $20,000 was consideration, it was not reasonably equivalent to the value received.

(7) The Debtor was insolvent or became insolvent shortly after the transfers were made. At the time of the transfers, the Debtor had contingent liability for Anne's lease with WBC based upon her personal guarantee of the lease. The lease called for monthly rental payments between $3,000 and $4,000 for a period in excess of four years after the transfers. The Debtor made only $16,000 in salary for her work with Anne's Collections in 1991 and believed she had few other assets.

(8) The transfers occurred shortly before or shortly after a substantial debt was incurred. Under the terms of the lease with

WBC, Anne's was not required to pay any rent for the months of August, 1990 through March 1991. The Debtor's contingent liability, therefore, arose in March 1991 when the first rent payment became due. Her debt to WBC became noncontingent in September 1991, when Anne's failed to pay the rent.

Under Ohio law, inadequate consideration, an intra-familiar transfer, and the threat of execution constitute three badges of fraud that are in themselves sufficient to find actual intent. *Profeta,* 75 Ohio App.3d at 628, 600 N.E.2d 360.

Given that the Debtor testified that she transferred her interests in the real property assets to prevent Vroom from taking them and that a number of the "badge of fraud" factors were present in the transfers, the Court finds that those six transfers were made with the actual intent to hinder, delay, or defraud a creditor. That Vroom may not have been able to execute against the residence property because of its ownership form does not change this result.

Ohio Rev.Code § 1336.04 provides that a transfer is fraudulent as to a creditor if made with actual intent to hinder, delay, or defraud any creditor of the debtor. The transfer is fraudulent as to a creditor even if the creditor's claim arose after the transfer was made. There is a four-year statute of limitations which has yet to expire. Ohio Rev.Code § 1336.09(A).

### 2. Constructive Fraud

A transfer is also fraudulent as to a creditor if the transfer is made and the transferor does not receive reasonably equivalent value in exchange and if the Debtor intended to incur, or believed or reasonably should have believed that she would incur, debts beyond her ability to pay as they became due. Ohio Rev.Code § 1336.-04(A)(2)(b).

As previously found, the Debtor's interests in the six real property assets transferred exceeded $175,000 and no consideration was given for those transfers. Further, without those assets to sell, the Debtor, who believed she had few other assets, clearly could not pay her debt to WBC which she should have believed she would have to pay. Therefore, constructively fraudulent transfers have been shown under Ohio Rev.Code § 1336.-04(A)(2)(b).

### C. *The Status of Dr. McFarland as Transferee of the Interests in Real Property.*

Dr. McFarland asserts that if the transfers are avoided, he is entitled to a lien for payments he made on the residence property between the time the deed was executed and the time the transfer was perfected by filing with the county recorder. Authority for this assertion is 11 U.S.C. § 550(d) or Ohio Rev. Code § 1336.08.

Under Ohio Rev.Code § 1336.08(C), a good faith transferee is entitled to a lien on property transferred only to the extent of the value given to the Debtor for the transfer. The Court previously has found that no value was given for these transfers. Therefore, there is no entitlement to any lien.

Under § 550(d)(1) of the Bankruptcy Code, a good faith transferee is entitled to a lien only for improvements made *after* the transfer. A person is not a good faith transferee, however, if he has knowledge sufficient to put him on inquiry notice of possible insolvency or if he has knowledge of the transferor's unfavorable financial condition at the time of the transfer. *Grant v. Podes (In re O'Connell),* 119 B.R. 311, 317 (Bankr.M.D.Fla.1990); *Armstrong v. Ketterling (In re Anchorage Marina, Inc.),* 93 B.R. 686, 693 (Bankr.D.N.D.1988).

Dr. McFarland testified that he believes the Debtor has no assets other than what appears on her bankruptcy schedules. He knew that other than working at Anne's and Fashion Expo Inc., the Debtor did not work outside the home during their 31 years of marriage. He also knew that much of the time the Debtor worked, she worked for no salary and that she was being sued by Vroom. Further, the "transfer" of her interest in the residence occurred after the large payment on the second mortgage was made by application of the proceeds of the certificate of deposit. Therefore, under the Bankruptcy Code, Dr. McFarland was not a good faith transferee.

### D. *The Debtor's Interest in the Certificate of Deposit.*

The Debtor's interest in the certificate of deposit is an asset within the meaning of Ohio Rev.Code § 1336.01. The certificate of deposit was established in early 1991, apparently to give greater assurance to a bank which had made a loan to the Debtor and her husband. The loan proceeds were to be used for the operations of Anne's. Repayment was secured by a pledge of a life insurance policy, a second mortgage on the residence, and by the inventory, accounts receivable and equipment of Anne's through its guaranty. The certificate of deposit account was assigned to the bank to be available, if needed, to pay down the loan. There was no showing of a perfected security interest in the certificate. After Anne's ceased operations, its inventory was liquidated and the proceeds paid to the bank. The certificate of deposit also was applied to reduce both the loan balance and the amount of the second mortgage.

The Court finds no transfer to Dr. McFarland of the Debtor's interest in the certificate of deposit. The only transfer was to the bank. That transfer was not done to defraud any creditor, but was part of the arrangement underlying the loan. Neither was there any constructive fraud because payment of an antecedent debt can be reasonably equivalent value within the meaning of Ohio Rev.Code § 1336.03(B).

In addition, the "transfer" by payment is clearly outside any preference period. Accordingly, the Debtor's prior interest in the certificate of deposit is not part of her bankruptcy estate.

### III. *Denial of Discharge.*

The Trustee's complaint also requests that the Debtor be denied a discharge in bankruptcy because she has transferred or concealed property on a continuing basis both before and after her bankruptcy filing within the meaning of 11 U.S.C. § 727(a)(2) and has knowingly and fraudulently made false oaths and accounts within the meaning of 11 U.S.C. § 727(a)(4).

### A. *Burden of Proof.*

■ As a preliminary matter the Court has been requested to determine the standard of proof for an objection to discharge.

The Debtor argues that the standard of proof for a denial of discharge is the clear and convincing evidence standard found by *G & J Investments v. Zell (In re Zell)*, 108 B.R. 615, 623 (Bankr.S.D.Ohio 1989). The Debtor asserts that the United States Supreme Court in *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) did not expressly address the applicable standard of proof with respect to § 727 of the Bankruptcy Code.

With respect to § 727(a)(4), however, the Debtor is mistaken about *Grogan*. The Supreme Court, in *dictum*, stated that the standard of proof for denial of a discharge pursuant to § 727(a)(4) is the preponderance of the evidence standard. *Grogan*, 498 U.S. at 687–89, 111 S.Ct. at 660, citing H.R.Rep. No. 95–595, p. 384 (1977) and S.Rep. No. 95–989, p. 98 (1978). The Supreme Court cited the legislative comment that "The fourth ground for denial of discharge is the commission of a bankruptcy crime, though the standard of proof is preponderance of the evidence". Such comment is too clear to permit any other result.

Since the *Grogan* decision, courts in at least eight districts have reversed their prior holdings and have held that a preponderance of the evidence is sufficient. *See First National Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *Hubbell Steel Corporation v. Cook (In re Cook)*, 126 B.R. 261, 265–266 (Bankr. E.D.Tex.1991); *Union Bank of the Middle East, Ltd. v. Farouki (In re Farouki)*, 133 B.R. 769, 776 (Bankr.E.D.Va.1991);[2] *United States v. Sumpter (In re Sumpter)*, 136 B.R. 690, 695 (Bankr.E.D.Mich.1991), *aff'd*, 170 B.R. 908 (Bankr.E.D.Mich.1994); *Nisselson v. Wolfson (In re Wolfson)*, 139 B.R. 279, 283

---

**2.** The United States District Court, Eastern District of Virginia, affirmed the bankruptcy court's decision. Subsequently, the Court of Appeals for the Fourth Circuit affirmed the district court's decision. 14 F.3d 244 (4th Cir.1994).

(Bankr.S.D.N.Y.1992) *aff'd* 152 B.R. 830 (S.D.N.Y.1993); *Clark v. Hiller, III (In re Hiller, III),* 148 B.R. 606, 612 (Bankr.D.Colo. 1992); *Amidei v. Metz (In re Metz),* 150 B.R. 821, 824 (Bankr.M.D.Fla.1993); and *Minsky v. Silverstein (In re Silverstein),* 151 B.R. 657, 660 (Bankr.E.D.N.Y.1993).

The bankruptcy court in *Wolfson* stated that "the reasoning which led the Supreme Court to conclude that the preponderance of the evidence standard was the appropriate burden of proof in Section 523(a) actions is equally compelling when considering Section 727(a) actions." 139 B.R. at 295.

Based upon these authorities, the Court finds that the standard of proof for all Section 727(a) actions to deny a discharge is the preponderance of the evidence standard.

**B.** *Denial of Discharge for Continuing Concealment of Property of Debtor.*

Section 727(a)(2) provides:

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ... has transferred, ... or concealed, or has permitted to be transferred, ... or concealed—

(A) Property of the debtor, within one year before the date of the filing of the petition; or

(B) Property of the estate, after the date of the filing of the petition;

The Trustee argues that, although the transfers by the Debtor with fraudulent intent of her interests in six parcels of real estate occurred more than one year before her bankruptcy filing, her retention of the benefits of ownership by continued use of those properties constitutes a continuing concealment of what are actually her assets. The Trustee further asserts that the Debtor has concealed her interest in certain household goods and furnishings.

■ Concealment of property for purposes of 11 U.S.C. § 727(a)(2)(A) generally involves the transfer of legal title of that property to a third party with the debtor retaining the benefits of ownership in the property. *See Ohio Citizens Trust Company v. Smith (In re Smith),* 11 B.R. 20, 22 (Bankr.N.D.Ohio 1981) and *Thibodeaux v. Olivier (In re Olivier),* 819 F.2d 550, 553 (5th Cir.1987). The key to a finding of concealment is the retention by the debtor of the inherent benefits of ownership with an accompanying divestiture of legal title. The original "concealment" may occur more than one year before the bankruptcy.

■ Under the doctrine of continuing concealment, however, "the concealment of an interest in an asset that continues, with the requisite intent, into the year before bankruptcy constitutes a form of concealment which occurs within the year before bankruptcy and, therefore, that such concealment is within the reach of section 727(a)(2)(A)." *Olivier,* 819 F.2d at 555.

■ The Court has reviewed the cases cited by the parties and has considered the facts in this case. It does not appear under existing case law or the facts in this matter that the Debtor has ever used or continues to use the Montana lot or the Brafferton Properties. She never paid any of the purchase price of these properties and has transferred the gift interest she received back to her spouse. She may benefit from income generated by these properties as part of the family unit and there may be tax consequences flowing to the joint tax obligation of the Debtor and her husband if their 1992 tax return is filed jointly. Those benefits do not seem sufficient, however, to conclude that a continuing concealment has occurred. While those transfers were fraudulent as to her creditors under state law, there has been no continuing concealment of any "retained interest" in the Brafferton Properties or the Montana lot. She presently has no equitable or legal interest in those properties except what a divorce court might determine in connection with a division of marital property. Those transfers do not fit the continuing concealment doctrine.

■ With regard to the McFarland residence, the question is somewhat different. Her use of that property has continued after the transfer of her interest to her spouse. The courts which have addressed an alleged

continuing concealment of real estate have identified the following factors as relevant: continued enjoyment of the property and continued payment of the real estate taxes and insurance. *Patton v. Hooper (In re Hooper)*, 39 B.R. 324, 328 (Bankr.N.D.Ohio 1984). The court in *Hooper* concluded, however, that merely residing in the transferred residence without accompanying indicia of ownership did not constitute concealment. 39 B.R. at 328. *See also Lucas v. Molden (In re Molden)*, 300 F.2d 5 (7th Cir.1962).

The facts of this case do not support a finding of continuing concealment of any retained interest by the Debtor in the McFarland residence. Her continued residence in the property is the only indicia of a beneficial interest. The Debtor does not make any of the tax or insurance payments associated with the McFarland residence. Additionally, she did not pay any of the purchase price and does not now contribute any money to the upkeep of the property.

Based upon this evidence, the Court finds that the Debtor did not retain a sufficient beneficial interest in the McFarland residence to constitute a concealment of that property under 11 U.S.C. § 727(a)(2)(A).

■ Finally, the Trustee alleges that the Debtor has continued to fraudulently conceal her interest in certain household goods and furnishings in the McFarland residence. The Debtor's position is that she never had any interest in them, never paid for them, and only occasionally participated in their selection. The Court has rejected that position as a matter of law, based upon the facts. However, her position was not unsupported under Ohio law. The goods at issue were not removed or otherwise hidden from the Trustee. In sum, the Court will not find that a legal or factual position which is rejected by the Court is *per se* a fraudulent concealment. A more forthright declaration of the identity and value of those items and her position would have been preferable, but the failure to do so does not in this case constitute a continuing concealment.

## C. *Denial of Discharge for False Oaths.*

To prevail on a false oath objection to discharge the Trustee must show that:

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account.

11 U.S.C. § 727(a)(4).

■ The false oath charges in this case come from the careless and negligent manner this Debtor manifests toward her bankruptcy schedules. She relied on an accountant whose focus appeared to be on large assets, business strategies and tax ramifications. She assumed certain positions about her ownership of assets because those positions appeared advantageous under the circumstances. Although this Court believes those positions were not well-founded, the facts of her financial status and participation in her family unit made those positions at least arguable.

The Debtor also exhibited a poor and perhaps, convenient, memory. This Court believes the Debtor has determined not to be very knowledgeable about certain financial matters. Her lack of awareness, while indicative of someone who has chosen not to function fully as an independent adult, is not necessarily fraudulent, however.

Omission of the real property transfers from her schedules was not a false oath because the schedules do not require that transfers more than one year before a bankruptcy filing be set forth. It is perhaps a better practice to show them and explain why they are not required than it is to omit them. But the dower interests were shown and the Court has not heard the parties deny that the transfers occurred. The legal effect which came from the record ownership was rather foolishly denied, but the fact of the transfers was not falsely denied.

The Debtor no longer had any ownership of the certificate of deposit when her bankruptcy was filed. Use of that asset occurred more than one year before the bankruptcy filing and was not a fraudulent transfer. Therefore, failure to disclose that interest was not a false oath.

Other omissions and erroneous values on the initial schedules are more problematic. Those include nondisclosure of share inter-

ests in two corporations, cash on hand, a checking account, certain costume jewelry and a few miscellaneous items. The value of her clothing was underestimated; she failed to answer correctly the questions about her position in Fashion Expo, Inc.; and her current family expenditure schedule was incorrectly completed. Finally, her interest in the household goods was not disclosed.

It is unclear why the shares were not originally listed. The Debtor does not deny her ownership, however, and the value of those assets is minimal.

 The difference between her value assessment of her clothing and that of the expert appraiser is significant. It is not material, however, because there is agreement that none of the items exceed the $200 limit imposed by the Ohio exemption statute. Although materiality is not specifically set forth in the statute, it certainly is relevant as to intent.

The cash in the Debtor's possession was not disclosed and should have been. The Court is not convinced that the Debtor understood what this question meant. Whatever that amount was, however, belongs in her estate.

The checking account omission is culpable. Disclosure was made on the amended schedules, however, although the amount is incorrect and understated. The Debtor's stated belief that the account was not hers is incorrect. Use of the account to pay her bankruptcy costs is indicative of a lack of intent to conceal the asset, however.

The costume jewelry nondisclosure was culpable, but was disclosed by amendment and the items appear to be within the exemption permitted by law. Omission of her golf clubs and other sporting equipment appears to have been inadvertent.

Nondisclosure of the officer position with Fashion Expo, Inc. is somewhat puzzling. Certainly the Debtor held herself out to third parties as an officer, but her testimony was that she did not think she was. That indifference to accuracy is disturbing. In a financial sense, however, this error is not material.

The current family income and expenses schedule was incorrectly completed. Without more information, however, the Court is not convinced that that problem was caused by the Debtor.

Omission of the household goods was not well handled. The goods should have been estimated as to value with an indication made that the Debtor was taking a position of no ownership. Omission, without explanation, raised more concerns and issues than disclosure would have. Given that her attorneys adopted either her or her accountant's version of the facts regarding that non-ownership and have defended that position legally, the Court is not inclined to call that a false oath. Dr. McFarland did earn the money required for those purchases and he selected and purchased many of them on his own without advice from the Debtor. The remainder were jointly selected. The Debtor generally did not select or pay for these things alone.

In sum the Debtor, by swearing to the accuracy of her schedules, made false oaths with regard to her lack of stock ownership, her position in Fashion Expo, her joint checking account, the cash she had on hand at the time of her bankruptcy filing, and the existence of certain jewelry and sporting goods items. The larger question is whether such false statements were made knowingly and fraudulently.

All of these omissions and understatements collectively raise serious questions about the Debtor's intentions toward her bankruptcy proceeding and about her veracity. The number of those problems, rather than any of them singly, concerns the Court. The insignificant value of any of the "assets" found to have been the subject of the false oaths, other than the checking account, however, make it less likely that any fraudulent intent was meant. And the Court believes the significant amount in the checking account came from a deposit made between the time the Debtor had signed her bankruptcy schedules and the attorneys' office filed her petition. Therefore, at the time she signed the petition, she probably was not aware that there was a significant amount of money in that account. The only clear intentions to

defraud creditors in this case come from the real property transfers, which are beyond the one year reach of the disclosure question in the schedules, and, arguably, the position taken on the household goods, which the Court has found was not a false oath. It does not appear there was any reluctance to disclose what furniture and other goods Dr. McFarland supposedly owned. Nor was there any apparent hiding of these items from the appraiser.

The Court believes that the problem with the schedules in this case is carelessness and failure to take the process seriously rather than fraud. That was combined with a legal position that was aggressive, but not based upon fabricated facts. The remedy of a denial of discharge seems overly harsh for this behavior.

## IV. *Conclusion.*

Based upon the foregoing, the Court finds that the assets of Phyllis McFarland's estate include interests in six parcels of real property, stock in Anne's Collection, Inc. and Wainaco, $2,066.98 in a checking account at The Huntington National Bank, a possible small portion of a tax refund for 1991, a one-half interest in certain household goods, as set forth herein, and her clothing, jewelry and miscellaneous sporting equipment. Except for the real property interests, some of those interests may be subject to proper claims of exemption.

The Court further finds that the Debtor's transfers of her interests in the six parcels of real property may be avoided by the Trustee as fraudulent transfers under 11 U.S.C. § 544(a) and Ohio Rev.Code Chapter 1336.

Finally, the Court finds that the Trustee's request to deny a discharge to this Debtor is not well taken.

**IT IS SO ORDERED.**