In re Raymond A. LYALL, Debtor.

**MONTICELLO ARCADE LIMITED PARTNERSHIP, Appellant,**

v.

**Raymond A. LYALL, Appellee.**

Action No. 2:95cv1023.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 23, 1996.

Paul Ernest Eberhardt, Norfolk, VA, for Appellant.

Robert Vincent Roussos, Norfolk, VA, for Appellee.

## OPINION

REBECCA BEACH SMITH, District Judge.

This matter is before the Court on appeal, pursuant to 28 U.S.C. § 158(a), from two orders of the United States Bankruptcy Court for the Eastern District of Virginia entered July 11, 1995, and September 19, 1995. Appellant presents three issues in this appeal: (1) whether the bankruptcy court properly exempted Debtor's 1990 Acura Legend under section 34–26(7) of the Virginia Code; (2) whether the bankruptcy court accurately valued Debtor's 100% stock interest in Lyall Design, Inc., a professional corporation, by deducting $12,959.52 from the value of the corporate assets to reflect an unexpired lease commitment; and (3) whether the

bankruptcy court erred in apportioning a joint tax refund received by Debtor and his nondebtor wife equally between the two, rather than on the basis of income, or of taxes withheld.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 6, 1995, Raymond A. Lyall ("Debtor" or "Mr. Lyall") filed a voluntary Chapter 7 petition for bankruptcy in the United States Bankruptcy Court for the Eastern District of Virginia. Debtor listed Monticello Arcade Limited Partnership ("Creditor" or "Monticello") as a creditor holding an unsecured nonpriority claim for back rent in the amount of $20,000.00.

In Schedule B of his petition, Mr. Lyall listed his personal property and assigned a value to each item. In paragraph 12, he listed 100 shares of stock in Lyall Design, Inc., valued at $100.00. In paragraph 17, Mr. Lyall listed his 1994 tax refund, valued at $1.00. Finally, in paragraph 23, Mr. Lyall listed a 1990 Acura Legend, valued at $8,800.00.

In Schedule C, Mr. Lyall listed certain property as exempt from distribution by the trustee in bankruptcy. The first three entries in Schedule C are at issue in this appeal. Mr. Lyall listed his stock interest in Lyall Design, Inc., as exempt under Virginia's general homestead exemption, Va.Code Ann. § 34–4. He listed his 1994 tax refund under that same exemption. Finally, Debtor listed his Acura Legend as exempt under Virginia's "Poor Debtor's Exemption," Va. Code Ann. § 34–26.

Monticello filed a timely objection to these exemptions. It objected to the exemption of Debtor's car as a tool of the trade under section 34–26(7), to the valuation of Debtor's stock interest in Lyall Design, and to the valuation of Debtor's 1994 tax refund. United States Bankruptcy Judge Marvin R. Wooten conducted an evidentiary hearing on Monticello's objections on July 11, 1995.

Judge Wooten first addressed the question of whether Debtor's automobile is exempt under section 34–26(7). Debtor's 1990 Acura Legend has a loan value of $9,900. Debtor

is an architect. He uses the car to commute to and from work and also to travel to meetings with clients and to inspect job sites. Monticello first argued that Debtor does not require a car to perform his job. Next, Monticello insisted that even if Debtor does require a car, he does not need a car as valuable as his 1990 Acura in order to perform his job. The bankruptcy court ruled that Mr. Lyall's car is exempt under section 34–26(7) as a tool of his occupation. The court further ruled that it would not inquire into whether Debtor's job requires a car as valuable as the Acura.

The court next addressed the valuation of Debtor's stock interest in Lyall Design, Inc. Mr. Lyall testified at the hearing and produced an analysis, which valued his stock interest at $1,558.41. That figure was arrived at by adding the value of the corporation's assets and subtracting its liabilities, including an unexpired lease obligation for office space currently occupied by the corporation, valued at $12,959.52. The bankruptcy court accepted this methodology and set the value of Debtor's stock at $1,558.41.

Finally, the court considered the value of Debtor's 1994 tax refund. Mr. Lyall filed federal and state joint tax returns with his wife on March 31, 1995. The couple's combined adjusted gross income for 1994 was $39,488. Their tax return showed that $37,927 of this amount was income produced by Debtor; $1,561 was shown as income produced by Debtor's wife. The 1994 federal income tax due from the Lyalls was $2,921. Because $5,508 had been withheld from Debtor's earnings, and $90 had been withheld from Mrs. Lyall's earnings, the couple was entitled to a joint refund of $2,677. The 1994 state income tax due from the Lyalls was $1,196. Because $2,288 had been withheld from Debtor's earnings, the couple was entitled to a joint refund of $1,092. The Lyalls' combined tax refund for 1994, therefore, was $3,769.

The question before the bankruptcy court was how to divide that tax refund between Debtor and his nondebtor wife. Judge Wooten did not incorporate a decision on this issue into his ruling because the parties advised the court that they would attempt to reach an agreement on the proper allocation of the refund. Judge Wooten did, however, indicate that the portion of the tax refund attributable to Debtor and his wife should be proportional to the income of each during the relevant year. The parties failed to reach an agreement on the proper allocation, so the issue was decided by United States Bankruptcy Judge David H. Adams by order entered September 19, 1995. Judge Adams ordered that the tax refund be apportioned between Mr. Lyall and his wife based on Mr. Lyall's ½ interest in the refunds, totalling $1,884.50. Judge Adams indicated in a letter addressed to the parties that he based his decision on *Bass v. Hall*, 79 B.R. 653 (W.D.Va.1987), where the court held that joint tax refunds should be divided equally between husband and wife.

## II. ANALYSIS

### A. 1990 Acura Legend

The first issue before the Court is whether Mr. Lyall's Acura is exempt from distribution by the trustee under section 34–26(7) of the Virginia Code. Both parties have presented this issue as a question of law; therefore, the Court will review the bankruptcy court's ruling on this issue *de novo*. *See, e.g., Hager v. Gibson*, 188 B.R. 194, 196 (E.D.Va.1995) (conclusions of law in bankruptcy appeals reviewed *de novo* and factual findings reviewed under a clearly erroneous standard).

The bankruptcy estate includes "all legal or equitable interests of the debtor at the commencement of the case." 11 U.S.C. § 541(a)(1). A debtor may, however, exempt certain property from distribution by the trustee in bankruptcy. 11 U.S.C. § 522. Under the Bankruptcy Code, a state may opt-out of the Code's exemption scheme by enacting its own set of exemptions. 11 U.S.C. § 522(b). Virginia has elected to opt-out of the Federal exemption scheme. Va. Code Ann. § 34–3.1. The Court, therefore, must look to state law to determine whether Debtor may exempt his automobile from distribution. Virginia's "Poor Debtor's Exemption" removes certain items of personal property from distribution by the trustee. Va.

Code Ann. § 34–26. The exemption provides, in relevant part, the following:

> [E]very householder shall be entitled to hold exempt from creditor process the following enumerated items:
>
> \* \* \* \* \* \*
>
> (7) Tools, books, instruments, implements, equipment, and machines, including motor vehicles, vessels, and aircraft, which are necessary for use in the course of the householder's occupation or trade not exceeding $10,000 in value, except that a perfected security interest on such personal property shall have priority over the claim of exemption under this section. A motor vehicle, vessel or aircraft used to commute to and from a place of occupation or trade and not otherwise necessary for use in the course of such occupation or trade shall not be exempt under this subsection.

*Id.*

The present version of the "tools-of-the-trade" exemption is the result of a 1990 amendment. Prior to that amendment, the exemption only covered tools and utensils used by a mechanic. Under the prior law, courts uniformly held that automobiles were not exempt. *See, e.g., In re Allen,* 52 B.R. 206, 212 (Bankr.E.D.Va.1985) (holding that a carpenter's truck used to store tools and to commute to and from job sites was not a tool of the trade under the statute); *In re Dummitt,* 2 B.R. 136, 138 (Bankr.W.D.Va.1980) (holding that an automobile could never be exempt as a tool of the trade under section 34–26). The 1990 amendment specifically overruled these cases and allowed for exemption of a car as long as it is necessary for use in the debtor's occupation. Since the amendment, no court has interpreted section 34–26(7) as it relates to automobiles.

■ When interpreting a legislative enactment, a court must read unambiguous statutory language in accordance with its plain meaning. *Miller v. Commonwealth,* 172 Va. 639, 648, 2 S.E.2d 343 (1939). Under Virginia law, bankruptcy exemptions must be liberally construed in favor of the debtor. *See, e.g., In re Perry,* 6 B.R. 263, 264 (Bankr. W.D.Va.1980). Here, the statute exempts tools, including motor vehicles, "necessary for use in the course of the householder's occupation or trade." It goes on, however, to preclude exemption of a motor vehicle which is used to commute to and from the work place unless it is "otherwise necessary for use in the course of [the debtor's] occupation or trade." Va.Code Ann. § 34–26(7). The application of the statutory exemption, then, depends upon the meaning of the word "necessary." The word "necessary" is used in ordinary conversation; it is neither a technical term, nor a term of art. It therefore must be interpreted in accordance with its common meaning.

Webster's dictionary defines "necessary" as that which is "absolutely needed" or "required." Webster's Ninth New Collegiate Dictionary 790 (1985). According to Black's Law Dictionary, depending upon the context in which it is used, the term "necessary" can mean "that which is indispensable or an absolute physical necessity" or "that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought." Black's Law Dictionary 1029 (6th ed. 1990).

Prior to the 1990 amendment to section 34–26, the statute itself did not require a mechanic's tool to be necessary to the mechanic's trade for it to be exempt. The courts, however, imposed necessity as a required element. *See In re Quidley,* 39 B.R. 362, 367 (Bankr.E.D.Va.1984). In *Quidley,* the court established the following test: " 'Is the item claimed to be exempt reasonably necessary both in kind and in quality for the workman to perform his chosen craft in an efficient and competent manner?' " *Id.* (quoting *In re Reed,* 18 B.R. 1009, 1010 (Bankr.W.D.Ky.1982)). Although the 1990 amendment adopted the courts' necessity requirement, it did not directly codify the requirement as articulated in *Quidley.* The statute, as it is now written, simply requires that the tool be "necessary"; the statute does not define the term "necessary" or embellish it with modifiers such as "reasonably."

■ From this background, the Court finds that section 34–26(7) exempts only those tools which the debtor absolutely requires in order to efficiently and competently perform the functions of his occupation or

trade. A motor vehicle is only exempt under the statute if it satisfies this standard without regard to its use by the debtor to commute to and from his place of occupation. This interpretation of the statute comports with the common understanding of the term "necessary" as well as the policy behind the tools-of-the-trade exemption. That exemption allows a debtor to continue earning a living after filing for bankruptcy. The reading of the statute which this Court establishes will allow a debtor to retain tools that he absolutely needs to continue working efficiently and competently in his or her chosen field. It does not, however, allow the debtor to keep items which are merely convenient or useful. The Court's interpretation allows debtors to continue their employment, while also protecting creditors from debtors who would shelter items not within the spirit of the exemption.

In this case, it is unclear from the record on appeal whether Mr. Lyall's 1990 Acura may properly be considered "necessary" under the statute. The only evidence before the Court is an admission from Monticello that Mr. Lyall uses the car to commute to and from work and also to visit clients and job sites during the workday. Neither side has presented evidence whether the car is an absolute requirement for Mr. Lyall to efficiently and competently perform his work as an architect. All that is clear from the record is that he uses it in his profession. There is no evidence, however, whether he *needs* to use it in this manner. After reviewing the transcript of the hearing on July 11, 1995, it is not clear to this Court whether the bankruptcy court considered the issue of necessity. The bankruptcy court seemed to focus on the question of whether a 1990 Acura is a "luxury" car. That was not the proper inquiry.[1] Therefore, this matter is REMANDED to the bankruptcy court to determine whether Mr. Lyall *needs* to use his car in the course of his occupation as an architect consistent with the standard set forth in this Opinion.

1. *See infra* at 83.

2. The value of the car is not at issue here because neither the valuation offered by Debtor, $8,000, nor that offered by Monticello, $9,900, exceeds

■ Monticello presents another issue related to the exemption of Debtor's car. It argues that, to be exempt under the statute, a tool must be of a necessary type and also of a necessary quality. In this case, Monticello argues that, although Mr. Lyall may require a car in order to perform the functions of his job, he does not require a "nice" car—more specifically, a car as nice as his 1990 Acura. Monticello contends that a luxury car, such as Debtor's, is not necessary to his occupation as an architect.

The Court does not agree with Monticello's interpretation of the statute on this point. First, the statute itself sets an upper limit on the quality of tools which are exempted by restricting the exemption to $10,000. With this restriction, there will not be a case where a debtor is allowed to exploit the statute by exempting a car valued above $10,000.[2] Second, and more importantly, a bankruptcy court should not be placed in a situation where it must make a factual determination of what quality of car is needed for the debtor's occupation. Does a doctor require a more expensive car than a laborer? Does a real estate agent need a better car than a lawyer? These are difficult questions which are better avoided in this context. *See Perry*, 6 B.R. at 265 (holding that debtor may exempt $2,500 mink coat under Virginia's former exemption for necessary wearing apparel, the court stated that "courts should not indulge in inquiries as to extravagance or bad taste of a debtor's wearing apparel in any consideration relating to its necessity"). Accordingly, the Court finds that once a tool is determined to be necessary under the statute, it is exempt up to $10,000, regardless of whether a less valuable tool would suffice.

### B. Stock in Lyall Design, Inc.

■ Debtor owns a 100% stock interest in Lyall Design, Inc., a professional corporation rendering architectural services. Mr. Lyall listed this stock interest as exempt

the $10,000 statutory cap. Even if the value of Debtor's Acura were at issue, this would be a factual determination to be decided in the first instance by the bankruptcy court.

under Virginia's general homestead exemption. *See* Va.Code Ann. § 34–4. Monticello objected to the value Debtor assigned to his stock interest in Lyall Design. At the hearing before the bankruptcy court, Mr. Lyall produced a balance sheet showing the assets and liabilities of the corporation. The court subtracted the balance of an unexpired lease obligation, $12,959.52, from the amount of the corporate assets to place a value on Debtor's stock interest at $1,558.41. The valuation of Debtor's stock is important because the property protected under Virginia's homestead exemption may not exceed $5,000 in value. *Id.* The bankruptcy court's valuation of Debtor's stock interest is a factual determination. The Court, therefore, will review the bankruptcy court's ruling on this issue under a clearly erroneous standard. *See Hager,* 188 B.R. at 196.

Monticello argues in this appeal that the bankruptcy court erred in subtracting the balance of the unexpired lease obligation from the value of the corporate assets. The lease payments at issue are only due post-petition. Monticello contends that these payments will be made from post-petition accounts and will contribute to post-petition income for Mr. Lyall. Because post-petition income is not included in the bankruptcy estate, Monticello argues that post-petition obligations, like the lease obligation here, should not be subtracted from the value of the corporation's assets when placing a value on Debtor's stock interest.

Mr. Lyall argues that the lease obligation must be subtracted from the corporate assets in order to accurately reflect the value of his stock in the hands of the trustee. The parties agree that if the corporation were liquidated, the lease obligation would be a cost of liquidation. Mr. Lyall argues that this liquidation cost must be figured into the value of his stock because the trustee would have to liquidate the corporation, if he took control of the stock, since Lyall Design is a professional corporation. *See* Va.Code Ann. § 13.1–549 (stating that only architects and employees of the corporation may own stock in a professional corporation established to offer architectural services). Monticello insists that it is wrong to consider what would happen during a hypothetical liquidation, because the corporation has no plans for liquidation, and it is, in fact, a going concern.

A trustee in a Chapter 7 bankruptcy must "promptly liquidate the nonexempt assets of the estate." *In re Latorre,* 164 B.R. 692, 695 (Bankr.M.D.Fla.1994). Mr. Lyall offered uncontested testimony at the hearing that there is no ready market for stock in professional corporations rendering architectural services. Therefore, if the trustee were to acquire Debtor's stock in Lyall Design, he would be forced to sell the assets of the corporation in order to obtain any benefit from the stock. Monticello concedes that the lease obligation at issue in this appeal would be a cost of liquidation. The value of Mr. Lyall's stock, therefore, must reflect the corporation's lease obligation which would have to be discharged by the trustee, if he were to acquire the stock and subsequently liquidate the corporation.

Monticello's argument that the lease payments will contribute to post-petition income is misleading. It is true that if Mr. Lyall retains possession of the stock, the corporation will obtain a benefit from its lease, i.e., it will be entitled to occupy its current office space, and that this benefit will contribute to Mr. Lyall's post-petition income. However, the Court must look to the value of the stock in the hands of the trustee, rather than in the hands of the Debtor. The value of the stock in the hands of the trustee is obviously lower because of the corporation's lease obligation. The cost to discharge this obligation, therefore, must be subtracted from the value of the corporate assets to arrive at a true valuation of Debtor's stock. The bankruptcy court's ruling on this point, therefore, is AFFIRMED.

## C. 1994 Tax Refund

Mr. and Mrs. Lyall filed state and federal joint tax returns for 1994. They received tax refunds totalling $3,769. At issue in this appeal is what portion of the refunds should be allocated to the debtor, Mr. Lyall, and what portion should be allocated to Mrs. Lyall. It is undisputed that Mr. Lyall's income constituted 96% of the couple's combined income, and that withhold-

ings from Mr. Lyall's paychecks represented 98.9% of the taxes withheld for the couple during 1994. The bankruptcy court ruled that the tax refunds should be allocated equally between Mr. and Mrs. Lyall. Monticello appealed that ruling, contending that the tax refunds should be allocated proportionally in accordance with income produced or taxes withheld.

Courts which have confronted this issue have taken three distinct positions. A majority of courts have held that tax refunds from a joint tax return should be allocated between husband and wife proportionally, in accordance with tax withholdings during the relevant year. *See In re McFarland*, 170 B.R. 613, 620 (Bankr.S.D.Ohio 1994); *In re Honomichl*, 82 B.R. 92, 94 (Bankr.S.D.Iowa 1987); *In re Alden*, 73 B.R. 215, 216 (Bankr. N.D.Fla.1986); *In re Ballou*, 12 B.R. 611, 612 (Bankr.D.Kan.1981). Other courts have allocated joint tax refunds proportionally, in accordance with income produced. *See In re Levine*, 50 B.R. 587 (Bankr.S.D.Fla.1985); *In re Verill*, 17 B.R. 652, 655 (Bankr.D.Md. 1982); *In re Kestner*, 9 B.R. 334, 336 (Bankr. E.D.Va.1981); *In re Colbert*, 5 B.R. 646, 648–49 (Bankr.S.D.Ohio 1980). Finally, at least one court has held that joint tax refunds should be allocated equally between husband and wife without regard to tax withholdings or income produced. *Bass v. Hall*, 79 B.R. 653, 656 (W.D.Va.1987).

▮▮▮ In this case, the bankruptcy court relied upon *Bass v. Hall*, and divided the Lyall's tax refund equally between Mr. and Mrs. Lyall. How to divide a joint tax refund between husband and wife is a question of law; therefore, the Court will review the bankruptcy court's ruling on this issue *de novo*. *See Hager*, 188 B.R. at 196. The Court finds the position of the majority on this issue more persuasive than the position articulated in *Bass*.

If the proper amount for taxes had been withheld from Mr. Lyall's income during 1994, the money now refunded by the government would have been included in his bankruptcy estate as pre-petition income. If Mr. Lyall had given the money to his wife directly, it would have been set aside as a fraudulent conveyance and likewise been in-

cluded in the bankruptcy estate. *See* 11 U.S.C. § 548(a)(2). There is no reason for a different result simply because the Debtor, for a short period of time, deposited his money with the government, and later filed a joint return.

▮▮▮ It is well-established that filing a joint tax return does not alter property rights between husband and wife. *See, e.g., In re Wetteroff*, 453 F.2d 544, 547 (8th Cir. 1972). In *Wetteroff*, the court stated the following:

> Congress, in enacting § 6013(a) which allows a husband and wife to file a 'single return jointly of income taxes,' intended primarily to equalize the tax burden for married persons in all states, eliminating the disparities which resulted between common law and community property states. In any event, Congress most definitely did not intend § 6013(a) to affect or change the ownership of property rights between taxpayers.

*Id.* If Mr. Lyall had filed an individual tax return, his entire refund would be included in the bankruptcy estate. *See, e.g., Turshen v. Chapman*, 823 F.2d 836, 838 (4th Cir.1987) (holding that a debtor's income tax refund is property of the bankruptcy estate). Because the filing of a joint tax return does not affect property rights, the portion of a married couple's joint tax refund which the debtor would have received had he filed individually should likewise be included in the bankruptcy estate.

The question then is how to divide a joint tax refund between husband and wife in a way which approximates what each would have received had the husband and wife each filed individually. Dividing the refund equally between husband and wife, while simple to administer, has the potential of resulting in a distribution which is totally unrelated to the refund each would have received had individual returns been filed. Dividing the refund proportionally in accordance with income produced raises the same concern. For example, a husband and wife may earn the same salary, but one may withhold more than the other, thereby entitling that person to a greater refund.

▮▮▮ The most equitable and efficient method of dividing a couple's joint tax refund

between husband and wife is to allocate a percentage of the refund to each, in accordance with the percentage each spouse contributed to the couple's total withholdings. This method is easy to administer and results in a fair distribution of the joint tax refund.[3] Moreover, this is the method used by the Internal Revenue Service to distribute refunds between husband and wife when there is a dispute between the two over the amount of the refund to which each is entitled. *See Gordon v. United States*, 757 F.2d 1157, 1160 (11th Cir.1985); *United States v. Mooney*, 400 F.Supp. 98, 99 (N.D.Tex.1975).

In this case, the parties are in agreement that Mr. Lyall withheld $5,508 for federal income tax and $2,288 for state income tax, and that Mrs. Lyall withheld $90 for federal income tax. Mr. Lyall made 98.9% of the couple's tax withholdings; therefore, 98.9% of the couple's joint tax refund must be attributed to Mr. Lyall. Their combined state and federal refund was $3,769. Of this amount, $3,727.54 is attributed to Mr. Lyall and included in the bankruptcy estate, and $41.46 is attributed to Mrs. Lyall.

The bankruptcy court's ruling on this issue is REVERSED.

### III. CONCLUSION

The judgment of the bankruptcy court on the valuation of Debtor's stock interest in Lyall Design, Inc., is AFFIRMED. The bankruptcy court's ruling on the allocation of the Lyall's joint tax refund is REVERSED. This matter is REMANDED to the bankruptcy court for further proceedings consistent with this Opinion to determine whether Debtor's 1990 Acura is necessary to his occupation as an architect.

It is so ORDERED.

---

**3.** In actuality, the most exact method of determining the refund to which a husband and wife would be entitled had they filed individually is to figure their tax liability as if they had filed individually, divide any benefit from a joint filing equally between the two, and then ascertain the amount of the refund due each. Although this method is accurate, it is also time-consuming and basically unnecessary. This Court finds that dividing a joint tax refund in accordance with withholdings strikes a sensible balance between absolute precision and the need for equity and efficiency. This method comports with that of the majority of courts which have decided this issue.